### UNITED STATES of America

v.

### Louis THOMPSON, Appellant.

### No. 76–1976.

United States Court of Appeals, Third Circuit.

Argued Jan. 11, 1977.

Reargued En Banc May 12, 1977.

Decided Aug. 22, 1977.

Defender Ass'n of Philadelphia, Joseph G. Block, and Alan A. Turner, Philadelphia, Pa., for appellant.

David W. Marston, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Chief, Appellate Section, Wallis W. Wetlesen, Asst. U. S. Atty., Philadelphia, Pa., for appellee.

Argued Jan. 11, 1977.

Before GIBBONS and GARTH, Circuit Judges, and COHEN, District Judge.

Reargued en banc May 12, 1977.

Before SEITZ, Chief Judge, and VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

On January 13, 1976, a federal grand jury sitting in the Eastern District of Pennsylvania returned Indictment No. 76–22, charging Louis Thompson in two counts for distribution of a controlled substance (heroin), in violation of 21 U.S.C. § 841.

On April 6, 1976, the district court issued a writ of habeas corpus ad prosequendum directing the United States Marshal and the Warden of the Philadelphia Detention Center to produce the defendant, then being held at the Holmesburg Prison for service of a state criminal sentence of three to twenty-three months,[1] for arraignment on

---

[1] In addition to its state function, Holmesburg Prison is regularly used by the United States for pre-trial detention for those accused of federal crimes (App. p. A–31). We note that the Government took the position at the trial that the Detainer Agreement was never invoked (A–20), even though it conceded in its Answer to the Motion to Dismiss (A–10) that a "federal detainer" of unspecified terms "was lodged for the instant indictment [on March 25, 1976]."

April 9, 1976. On that date the defendant was arraigned at the United States Court House, 601 Market Street, Philadelphia, Pennsylvania, and then returned to state custody at the Holmesburg Prison. On May 3, 1976, the defendant appeared before the district court for trial pursuant to a second writ of habeas corpus ad prosequendum.

■ Prior to trial the defendant filed a motion to dismiss the indictment pursuant to Article IV(e) of the Interstate Agreement on Detainers Act (the Detainer Agreement), 18 U.S.C. App. p. 232 (1977 Supp.). After oral argument, the district court denied the motion on May 3, 1976, ruling that "the Interstate Agreement on Detainers Act is not applicable in a case in which the federal government is trying a prisoner serving a state sentence within the geographical limits of the state in which the federal court is sitting." (A–30).[2]

On May 5, 1976, after a jury trial, defendant was found guilty on both counts of the indictment. On July 9, 1976, the defendant was sentenced to two years' imprisonment and a consecutive three-year special parole term. This appeal by defendant followed.

This court directed the listing of this appeal for rehearing en banc by order of January 28, 1977.

A summary outline of the Detainer Agreement appears in *United States ex rel. Esola v. Groomes,* 520 F.2d 830, 833–34 (3d Cir. 1975). The purposes underlying the Interstate Agreement on Detainers are set forth in an opinion filed earlier today in *United States v. Sorrell,* 562 F.2d 227 (3d Cir.).

■ Particularly because the appellant was not as available to his counsel in the period between April 9, 1976, when he was produced at the United States Court House, 601 Market Street, and May 3, 1976, when he appeared for trial, as he would have been if the federal authorities had retained custody of him during this period,[3] we cannot say that the failure to comply with the Detainer Agreement's purpose of having him tried, with the effective assistance of counsel, promptly after his custody is first transferred from state to federal authorities is so insubstantial that the wording of Article IV(e) of the Detainer Agreement[4] should not be applied according to its terms. If Thompson had remained in federal custody on and after April 9, the vehicles of the United States Marshal making regular weekday trips from the Holmesburg Prison to the United States Court House at 601 Market Street could have brought him to a place of easy accessibility to his lawyer, whereas a trip to Holmesburg Prison, which was required for consultation between attorney and client as long as he was in state custody and the lawyer had to go to him and return, would take his lawyer at least one-half a day. Furthermore, we believe the Detainer Agreement should be enforced according to its terms without the district court's being required to judge those terms, including IV(e), in the light of the Detainer Agreement's statutory purposes, as stated in Article I (see *Sorrell* at pages 229–230), every time the prosecutor chooses to

---

No proof of this allegation in the Answer appears in the record. We can see no reason why the application of the Detainer Agreement cannot be invoked by both such a federal detainer, assuming its wording was appropriate, and a subsequently issued writ of habeas corpus ad prosequendum, worded in accordance with the Eastern District of Pennsylvania form (see *Sorrell, supra* at note 6).

**2.** We reject the holding of the district court that the Detainer Agreement is not applicable where the Federal Government is trying a state prisoner serving his state sentence within the geographical limits of the state in which the federal district court is located. See *United*

*States v. Sorrell,* 413 F.Supp. 138, 140–41 (E.D. Pa.1976).

**3.** See *United States v. Sorrell,* 562 F.2d 227, 3 Cir. at note 3.

**4.** Article IV(e) of the Detainer Agreement, 18 U.S.C. App. p. 232 (1977 Supp.), provides:

"If trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to Article V(e) hereof, such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice."

ignore its wording. If Congress had wanted the district courts, in their discretion, to apply the clear provisions of Article IV(e) of the Detainer Agreement in the light of the purposes of such Agreement, such wording would have been included in Article IV(e).[5]

The judgment of the district court will be reversed and the case remanded with directions that the district court dismiss the indictment for the reasons stated above.

WEIS, Circuit Judge, dissenting:

The Interstate Detainers Act is obviously written to cope with problems arising when prisoners confined in one state are charged with crimes in another. Both prosecution and defense may have an interest in securing a speedy trial of outstanding charges. The state may seek to have a trial without the delay attendant on extradition. The prisoner may wish to have a determination of pending charges so that he may seek the advantages of concurrent sentences or earlier parole. Moreover, the prisoner may be denied rehabilitative programs because of interruptions caused by travel and attendance at criminal proceedings in other states.

When the Interstate Detainers Act was proposed by the Council on State Governments as Suggested State Legislation in 1957, state statutes were contemplated. Not until 1970 did the federal government adopt the Act and include itself as a "state." The legislative history is quite brief and demonstrates that Congress did not fully explore the legislation's ramifications as they affected the federal government.

So long as the Act included only states and not the federal government, geographical and sovereignty concepts posed no particular difficulty. But when the federal legislation adopted the text of the state compacts and involved the United States simply by including it within the definition of a "state," serious problems of interpretation arose. As an example, the Act's refer-

ence to trial being "commenced within one hundred and twenty days of the arrival of the prisoner in the receiving State," is clear and understandable if the prisoner is being transferred from New Jersey to Pennsylvania. Similarly, a transfer from New Jersey to the District of Columbia is workable under the federal version of the Act. Confusion arises, however, if the prisoner is being transferred from a state institution in Pennsylvania to a federal court in that state. In that instance, the prisoner has been in the United States, the "receiving state", continuously.

To enforce the speedy trial provisions of the Act, therefore, the federal courts must interpret "receiving state" to mean custody of the federal government. *See United States v. Ford,* 550 F.2d 732 (2d Cir. 1977). Since this interpretation carries out the Act's announced intention to afford a speedy trial, the semantic revision may be justified. If the statute were read literally, however, there could be no enforcement of the one hundred and twenty day limitation because there is no arrival date in a "receiving state."

Similarly in Article V(h), Interstate Agreement on Detainers Act § 2, Art. V(h), 18 U.S.C. App. at 233 (Supp.1977), the statute provides that responsibility for the prisoner rests with the receiving state from the time "a party State receives custody . . until such prisoner is returned to the *territory and custody* of the sending State . . .." Where the prisoner is transferred from a federal institution to a state, he has never left the United States. Does United States "territory" mean the confines of a federal institution? If a state prisoner is taken to a federal court located in the same state, when does the prisoner return to the "territory" of the state?

The government in this case has argued, as on other occasions, that Congress contemplated the federal government being affected only as a sending, not a receiving state. That interpretation makes the stat-

---

5. See last paragraph of note 3 in *United States v. Sorrell, supra.*

ute workable and reasonable.[1] The government's position, however, has been consistently rejected in the courts reviewing it. *See United States v. Mauro,* 544 F.2d 588 (2d Cir. 1976), *United States v. Scallion,* 548 F.2d 1168 (5th Cir. 1977). Article II, 18 U.S.C. App., at 230–231 (Supp.1977), defines the United States as a "state" without any qualification, and the legislative history furnishes no support for the government's interpretation. It is apparent that in adopting the Interstate Agreement Congress has attempted to fit a square peg into a round hole.

In *United States ex rel. Esola v. Groomes,* 520 F.2d 830 (3d Cir. 1975), a panel of this court concluded that the Agreement on Detainers Act is the sole means by which a prisoner may be transferred from another state for trial on state charges. In the case *sub judice,* that principle is extended to the federal system as well, thus restricting the writ of habeas corpus ad prosequendum.

Congress, I am confident, had no intention to limit federal courts in exercising their power to issue this writ first authorized by the Judiciary Act of 1789. The grant has been continued without interruption in legislation since that time. *See Carbo v. United States,* 364 U.S. 611, 81 S.Ct. 338, 5 L.Ed.2d 329 (1961); *Ex parte Bollman,* 4 Cranch 75, 2 L.Ed. 554 (1807). Not a word in the legislative history of the Interstate Agreement on Detainers Act hints of repealing or limiting the authority to issue the writ or, indeed, even mentions it.[2]

To read the ambiguous and superficially considered Agreement as constricting the power which has been exercised by the federal courts for almost two hundred years is a questionable solution to a perplexing problem. Recognizing the continuing scope of the writ of habeas corpus ad prosequendum might diminish in some respects the efficacy of the Interstate Detainers Act. That policy would offer federal prosecutors an alternative method of securing the presence of state prisoners for trial and, thus, deprive a state governor of the option to disapprove the request (a doubtful matter at best in the federal-state context); obviate the thirty day delay; and delete the requirement that the prisoner be kept in federal custody from time of original request to termination of trial. But the utilization of habeas corpus ad prosequendum would not defeat the primary aims of the Agreement—to permit the prisoner and authorities to obtain speedy disposition of outstanding detainers and prevent unnecessary interruptions to rehabilitative programs.

The facts of the two cases under consideration are graphic illustrations of the harm which restricting federal habeas corpus ad prosequendum can cause. In the *Sorrell* case, the interruption of the prisoner's reha-

1. The Senate Judiciary Committee in its 1975 report on S–1 commented that the enabling Act should be amended by "providing that the Federal Government is a participant in the Agreement only in the capacity of a 'sending state.'" Sen.Rep. 94–00, 94th Cong., 1st Sess. 983–984 (1975).

2. In the Senate Judiciary Committee report in 1975, referred to in n.1 supra, it is said:

"Federal prosecution authorities and all Federal defendants have always had and continue to have recourse to a speedy trial in a Federal court pursuant to 28 U.S.C. 2241(c)(5), the Federal writ of *habeas corpus ad prosequendum.* The Committee does not intend, nor does it believe that the Congress in enacting the Agreement in 1970 intended, to limit the scope and applicability of that writ.

"Unlike the existing Federal statute, however, the State statutes do not provide a writ of *habeas corpus ad prosequendum* with na-

tionwide territorial effect beyond the boundaries of the issuing State. Consequently, since the Agreement is only effective between member States, the Federal Government, at the urging of the Council of State Governments, has become a member State so that the other member States may use the Agreement to reach Federal prisoners against whom State detainers have been lodged who are incarcerated outside the lodging State's territorial boundaries.

"Clarification of the enabling act is necessary because at least one Federal court has indicated that in the absence of specific language to the contrary, it will interpret the Agreement to apply to all prisoner exchanges between member States and the Federal Government, thereby negating all use of 28 U.S.C. 2241(c)(5), the Federal writ of *habeas corpus ad prosequendum,* between the Federal Government and other member States."

bilitation program at Graterford consisted of the time for travel between Graterford and Philadelphia and a brief appearance in court for arraignment (certainly not a whole day), and the trial which would likely have required no more than a few days. All told, the prisoner's absence from the rehabilitation program would likely have been no more than a total of 7 to 10 days. Under the majority's view, however, Sorrell would have had to remain in federal custody from the date of arraignment till verdict, normally at least a month. That period of confinement would usually be in a facility in Philadelphia which does not offer rehabilitation programs. Thus, the goal of rehabilitation is not aided by the restrictive approach adopted by the majority, but is actually thwarted.

Moreover, the aim of a speedy trial would be hindered, not helped. The Federal Speedy Trial Act limits require that a prisoner be arraigned within ten days after indictment, 18 U.S.C. § 3161, but if his presence at that proceeding can only be obtained by recourse to the Detainers Act, a thirty-day period must elapse before he may be transported to the court. Article IV(a), 18 U.S.C. App. at 232 (Supp.1977). Thus, there is a direct conflict between the Speedy Trial Act and the Detainers Act which the majority's interpretation does not resolve but, in fact, creates.[3]

The situation created in the *Thompson* case is even more bizarre. He was serving a state sentence in the Holmesburg Prison in Philadelphia in April, 1976. On April 9, through the use of habeas corpus ad prosequendum, Thompson was brought to the federal courthouse in the same city for arraignment and was returned on the same day. He was returned to the courthouse on May 3 for trial, and on May 6, a guilty verdict was rendered. That conviction is now set aside as a result of the majority opinion.

Apparently, there was no rehabilitative program at Holmesburg, that institution being used only for short term sentences and pretrial detention.[4] Hence, no rehabilitation program was interrupted. The ultimate irony, however, is that the federal government and Philadelphia have contracted for the use of Holmesburg Prison as a detention center for federal prisoners. Thus, had the United States arranged for the technical "paper" transfer of Thompson from state to federal custody—within the very same institution—from the arraignment date to the date of sentencing, the conviction would stand.

In *United States v. Mauro, supra,* the Court of Appeals affirmed dismissals of indictments under the provisions of the Detainers Act. Judge Mansfield dissented on the ground that the writ of habeas corpus ad prosequendum was not a detainer within the meaning of the Act,[5] and refused to

---

**3.** The majority relies to some extent upon an asserted inconvenience to defense counsel as a ground for its interpretation of the statute. I find that basis unconvincing on the facts of these cases. If the transfers here had been within the state's jurisdiction, the removal of a prisoner from a penitentiary in Pittsburgh to a Pennsylvania court in Philadelphia, some 300 miles away, would involve more inconvenience than that present here. However, that, in and of itself, would be an unlikely ground for vacating a conviction.

**4.** In *United States v. Roberts,* 548 F.2d 665 (6th Cir. 1977), the court held that the Act did not apply to a pretrial detainee who was not participating in any rehabilitation program.

**5.** Despite dictum in the majority opinion, that point is not at issue here since in both cases detainers in the customary form had been lodged by the United States Marshal before the

writs of habeas corpus were served. However, I agree with the Courts of Appeals for the First Circuit, *United States v. Kenaan,* 557 F.2d 912 (1977); the Fifth Circuit, *United States v. Scallion, supra*; the Sixth Circuit, *Ridgeway v. United States,* 558 F.2d 357 (1977); and the dissenting opinion of Judge Mansfield in *Mauro, supra,* that a federal writ of habeas corpus ad prosequendum does not come within the meaning of the word "detainer" as used in the Act.

The handbook on Interstate Crime Control of the Council of State Governments (1949) contains a report of the joint committee on detainers, stating in part:

"A detainer may be defined as a warrant filed against a person already in custody with the purpose of insuring that, after the prisoner has completed his present term, he will be available to the authority which has placed the detainer. Wardens of institutions hold-

accept any implied repeal of the statute authorizing habeas corpus ad prosequendum. In *United States v. Ford, supra,* he wrote the majority opinion, holding that the speedy trial provisions of the Detainers statute applied to the federal government. In *United States v. Chico,* 558 F.2d 1047 (2 Cir., 1977), Judge Mansfield, writing for a unanimous panel, distinguished both *Ford* and *Mauro* in a fact situation similar to the case *sub judice.* There, the Court of Appeals for the Second Circuit held that when state prisoners were in the federal court for only the few hours required for arraignment and guilty pleas and were immediately returned to state imprisonment, they were never actually incarcerated by the federal government. That distinction could be utilized in the *Thompson* and *Sorrell* cases, but I think the better approach is to take the view espoused by the Courts of Appeals for the First and Sixth Circuits and to uphold the unrestricted availability of habeas corpus ad prosequendum. *See United States v. Kenaan, supra, Ridgeway v. United States, supra.*

I disagree with the majority opinion, but in fairness must recognize the difficulties caused by this poorly drafted legislation. The Act has created a problem which Congress should resolve expeditiously in the interest of efficient administration of criminal justice.

I dissent.

ADAMS and ROSENN, Circuit Judges, join in the conclusion reached in this dissent, primarily because they do not believe it should be assumed that Congress has cut back on an enactment as venerable as that of the Judiciary Act of 1789 in the absence of an express statement that Congress intended to do so.[6]

GARTH, Circuit Judge, dissenting:

On April 9, 1976, Louis Thompson, the defendant in one of these two cases, was serving a state sentence in the Holmesburg Prison, a state facility located in the Northeastern portion of Philadelphia. One week earlier, a federal district court judge in the Eastern District of Pennsylvania had issued a writ of habeas corpus *ad prosequendum* directing the warden of the Detention Center to deliver Thompson to United States marshals so that Thompson could be arraigned on federal charges at ten a. m. on April 9, 1976. On the morning of April 9, United States marshals took Thompson from Holmesburg Prison and transported him to United States Courthouse at 601 Market Street in center city Philadelphia. The distance travelled was less than ten miles. Thompson entered a plea of not guilty on a federal indictment which charged him with two counts of distributing heroin in violation of 21 U.S.C. § 841. After his arraignment, Thompson was promptly returned to Holmesburg. At that point, in the majority's view, the federal and state authorities erred. Instead of placing Thompson in the portion of Holmesburg in which federal prisoners are housed pursuant to a contract between the United States and the City of Philadelphia, Thompson was returned to the very cell from which he had been taken that morning. In addition, the United States did not begin to pay the City the dollar *per diem* to which state facilities which house federal prisoners are entitled.

When Thompson's attorney learned what had occurred, he moved on April 29 to have his client's federal indictment dismissed under the Interstate Agreement on Detainers, to which the United States is a party. That motion was denied; and, after a jury trial, Thompson was convicted on both counts and sentenced. The majority now holds that Thompson's federal indictment must be dismissed with prejudice—a remedy

---

ing men who have detainers on them invariably recognize these warrants and notify the authorities placing them of the impending release of the prisoner." (page 85)

**6.** Such a result would appear to be particularly appropriate here since the documents directing the transfer of the defendants to federal au-

thorities were specifically denominated as "writs of habeas corpus ad prosequendum." And there is no indication on the record that, at the time of such transfer, the United States Attorney or the defense counsel were operating under the assumption that the Interstate Detainers Act was then being utilized.

more severe than that which results in most instances in which the government commits constitutional violations.

The facts in the case of Leroy Sorrell—the defendant in the second case—are not notably different from those set out above, except that Sorrell was subjected to the more arduous journey from the State Correctional Institution at Graterford to the United States Courthouse in Philadelphia, a distance of less than 35 miles.

I must dissent from the results reached by the majority in these two cases. If I felt that Congress intended such absurd results when it made the United States a party to the Agreement, I would of course honor Congress's intent. But I seriously doubt that a single member of Congress contemplated that federal indictments would be dismissed with prejudice in situations such as these.

The legislative history makes this clear. When Representative Robert W. Kastenmeier introduced the Agreement in the House on May 4, 1970, he stated, "We know of no opposition whatsoever to this legislation." 116 Cong.Rec. 13999 (1970). Similarly, when Senator Roman Hruska introduced the Agreement in the Senate, he stated, "To the knowledge of this Senator, there is no opposition to this proposal." 116 Cong.Rec. 38840 (1970). The Agreement was twice passed by the House under suspension of the rules. 114 Cong.Rec. 11796 (1968); 116 Cong.Rec. 14000 (1970). It also passed in the Senate without a roll call vote. 116 Cong.Rec. 38842 (1970). The idea that there would have been "no opposition whatsoever" to the sort of results which have occurred in these cases is hard to

accept. That idea is even harder to accept when one realizes that there are probably hundreds of federal prisoners, parolees, and probationers who will be eligible to have their federal convictions vacated under the majority's interpretation of the Agreement.[1]

To date four other circuits have decided similar cases under the Agreement. Although the cases decided by those circuits—the First, Second, Fifth and Sixth—disagree on some points, none would require the dismissal of the defendants' indictments in these cases. *See United States v. Scallion,* 548 F.2d 1168 (5th Cir., filed March 18, 1977) (Agreement does not apply when prisoner transferred pursuant to federal writ of habeas corpus *ad prosequendum*); *United States v. Kenaan,* 557 F.2d 912 (1st Cir., filed July 7, 1977) (similar to *Scallion*); *Ridgeway v. United States,* 558 F.2d 357 (6th Cir., filed July 13, 1977) (similar to *Scallion; United States v. Chico,* 558 F.2d 1047 (2d Cir., filed June 20, 1977) (Article IV(e) of Agreement does not apply when state prisoners taken from state prisons pursuant to federal writs of habeas corpus and returned within a few hours and without being placed in a federal prison).

### I.

The defendants in these cases do not argue that their indictments should be dismissed on policy grounds. Instead, they ask us to refrain from "judicial legislation,"[1a] and they admonish us that "[s]tatutes should be applied as written by Congress."[2] I am convinced, however, that the terms of the Agreement do not require the dismissal of the indictments in these cases.

---

**1.** The majority opinion takes issue with my prediction that federal convictions will be vacated under the majority's interpretation. Obviously the interpretation adopted by the majority will be available in all future cases similar to those considered today. With respect to retroactive application, I question whether the majority's decision is one which can be made nonretroactive. In light of the majority's heavy reliance on *Esola,* it is quite clear that *Thompson* and *Sorrell* do not "establish a new principle of law . . . by overruling clear past precedent on which litigants may have

relied" [*Chevron Oil Co. v. Huson,* 404 U.S. 97, 106, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971)] and it is questionable whether those cases decide "an issue of first impression whose resolution was not clearly foreshadowed . . . ." *Id.* As a result, it is uncertain that the prerequisites for nonretroactivity can be met.

**1a.** Brief for Appellant at 8, *United States v. Thompson,* No. 76–1976.

**2.** *Id.* at 9. *See also* Brief for Appellee at 19, *United States v. Sorrell,* 562 F.2d 227, 3 Cir.

The majority holds that the indictments must be dismissed with prejudice because Article IV(e) of the Agreement was violated. That provision states

> If trial is not had on any indictment, information, or complaint contemplated hereby *prior to the prisoner's being returned to the original place of imprisonment pursuant to article V(e)* hereof, such indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

(Emphasis added.) Article V(e), in turn, provides:

> At the earliest practicable time consonant with the purposes of this agreement, the prisoner shall be *returned to the sending State.*

(Emphasis added.)

Finally, Article II(a) and (b) state:

> As used in this agreement:
>
> (a) *"State" shall mean* a State of the United States; *the United States of America* ; a territory or possession of the United States; the District of Columbia; the Commonwealth of Puerto Rico.
>
> (b) "Sending State" shall mean a State in which a prisoner is incarcerated at the time that he initiates a request for final disposition pursuant to article III hereof or at the time that a request for custody or availability is initiated pursuant to article IV hereof.

(Emphasis added.)

Thus the majority holds that the indictments in these cases must be dismissed with prejudice because the defendants were *returned to the sending State, i. e., Pennsylvania,* before their federal trials were completed. But in what sense were the defendants *returned* to Pennsylvania? They obviously were not returned in a geographical sense, since they never left the geographical boundaries of Pennsylvania. Instead, the majority's holding is based upon the theory that Article IV(e) of the Agreement was triggered in these cases because the defendants were transferred from state *custody* to federal *custody* and back to state *custody* before their federal trials were completed.[3] It seems clear however, that the draftsmen of the Agreement never intended transfers of custody to be the triggering events under Article IV(e).

Art. V(a) states in part:

> In the case of a Federal prisoner, the appropriate authority in the receiving State shall be entitled to temporary custody as provided by this agreement *or to the prisoner's presence in Federal custody at the place of trial,* whichever custodial arrangement may be approved by the custodian.

(Emphasis added.) Thus, when a state wishes to obtain a federal prisoner pursuant to the agreement, the federal government is never required to surrender "custody" of the prisoner. It can simply make the prisoner available for trial in state court while retaining custody of the prisoner. It is rather hard to believe that transfers of custody were intended to be the triggering events under Article IV(e) when another portion of the Agreement, Article V(a), includes a built in mechanism under which the federal government can always retain "custody" of a prisoner requested by another jurisdiction.

What is more, the draftsmen of the Agreement stated explicitly that they believed that the states could also comply with the agreement in a sending capacity without ever relinquishing "custody" of prisoners demanded by other jurisdictions. In the report which accompanied the Agreement when it was first proposed, the draftsmen wrote:

---

**3.** In *Thompson, see* at 232–235; In *Sorrell, see* 562 F.2d at 229.

The crux of Thompson's argument is: "The return of appellant to state *custody* subsequent to his arraignment but prior to trial was a clear violation of Article IV(e) . . . ." (Emphasis added.) Brief for Appellant at 6, *United States v. Thompson,* No. 76–1976. Similarly, Sorrell's counsel maintains that his client's indictment must be dismissed because "Mr. Sorrell was arraigned and returned to state *custody* rather than being retained in federal *custody* at the Philadelphia Detention Center." (Emphasis added.) Brief for Appellee at 7, *United States v. Sorrell,* 562 F.2d 227, 3 Cir.

Some thought was given to giving all jurisdictions the same option afforded the federal authorities in determining whether to give temporary custody or simply to make the prisoner available in their own custody. However, it was felt that in effect the states could achieve this same result by the process of deputizing officers to act for them. Moreover, in most instances it is not contemplated that states will find it convenient to make the prisoner available in their own custody. Council of State Government, Suggested State Legislation, Program for 1957 at 79 (1956); Council of State Government, Suggested State Legislation, Program for 1958 at 82 (1957). In other words, the draftsmen felt that if, say, Pennsylvania sought to try a New Jersey prisoner, New Jersey could comply with the agreement and still retain "custody" of the prisoner by deputizing the Pennsylvania sheriff to whom the prisoner was delivered. Indeed, as far as the draftsmen were concerned, New Jersey could deputize the United States Marshal into whose custody it delivered a prisoner requested by the federal government. It simply is inconceivable that the draftsmen would have happily contemplated those possibilities if transfers of "custody" were viewed as the triggering events under Art. IV(e).

Article V(d) and (g) of the Agreement provide further evidence that transfers of "custody" were not viewed by the draftsmen as the triggering events. Article V(g) attempts to explain who has custody of a prisoner temporarily released by one jurisdiction pursuant to a detainer lodged by another jurisdiction. It provides in relevant part:

> For all purposes other than that for which temporary custody as provided in this agreement is exercised, the prisoner shall be deemed to remain in the custody of and subject to the jurisdiction of the sending State. . . .

(Emphasis added.) Article V(d) states that "[t]he temporary custody referred to in this agreement shall be only for the purpose of permitting prosecution" on the charges lodged by the receiving state. It would

seem to follow, therefore, that a prisoner who is delivered to a receiving state under the Agreement remains in the custody of the sending state for all purposes other than his prosecution by the receiving state. Does that mean then that for the purpose of Article IV(e)—i. e., dismissal of the prisoner's indictment in the receiving state—the prisoner remains at all times in the custody of the sending state? It is inconceivable that the draftsmen would have created these ambiguities concerning the "custody" of a prisoner transferred from one jurisdiction to another under the Agreement if transfers of "custody" had been viewed as critical under Article IV(e).

In addition, if "custody" is the key under Article IV(e) then the application of Article IV(e) to many federal and state prisoners will raise questions of metaphysical subtlety. In whose "custody," for example is a prisoner who is serving concurrent state and federal sentences in a state facility? *See Tremarco v. United States*, 412 F.Supp. 550, 553 (D.N.J.1976). In whose "custody" is a prisoner serving concurrent state and federal sentences in a federal facility?

In whose "custody" is a federal prisoner confined in a state facility pursuant to a contract between the United States and the relevant state? Under 18 U.S.C. § 4082(a), all persons incarcerated for federal offenses are committed to "the *custody* of the Attorney General of the United States". But under 18 U.S.C. § 4002 the federal government is obligated to pay the states for "the care and *custody*" of persons confined in state institutions for offenses against the United States. And under Pa.Stat.Ann., Tit. 61, § 41 (1964), the "custody" of such prisoners is vested in the state authorities.

In whose "custody" is a person who has been convicted of state offenses but is confined in a federal facility pursuant to a contract between the respective jurisdictions? Under 18 U.S.C. § 5003(a), the "*custody, care*," etc. of such persons is committed to the Attorney General of the United States. But I would suspect that most states would regard all persons imprisoned for state offenses as being in state "custody."

Finally, in whose "custody" is a person convicted of an offense in one state (say, Pennsylvania) but imprisoned in another (say, New Jersey) pursuant to the Interstate Corrections Compact, which has been adopted by 22 states? *See* N.J.Stat.Ann., title 30, § 7C–1 *et seq.* (1977); Pa.Stat.Ann., title 61, § 1061 *et seq.* (1977); Del.Code Ann., title 11, § 6570 *et seq.* (1975).

In sum, it seems clear to me that transfers of "custody" are not the triggering events under Article IV(e). As a result, the defendants' argument that they are entitled to have their indictments dismissed under the literal language of the Agreement must fail.

## II.

I have argued at length in the preceding section that the key phrase "returned to the sending state" cannot be read to mean "returned to the custody of the sending state." It seems equally clear that, as long as the United States is regarded as a "state" within the meaning of the Agreement, the phrase "returned to the sending state" cannot be interpreted to mean "returned to the geographical area of the sending state." If that interpretation were adopted, then Article IV(e) would never be triggered in instances in which the United States was the sending state. Even if a federal prisoner incarcerated in Pennsylvania were taken to California to face state charges and then returned to Pennsylvania, he could not be said to have "returned" to the geographical area of the United States, since it is quite apparent that at no time had he ever left the United States.

The plain fact is that the literal language of the Agreement—which does not appear to have caused any problems with respect to transfers between states—simply does not make sense when applied to transfers involving the federal government. The reason for this anomaly seems clear: the Agreement appears to have been drafted with state-to-state transfers primarily in mind.

4. I have used the term "federal-state" transfers to refer to transfers in which the federal

Besides the provisions already discussed, there is additional evidence in the Agreement itself and in the report which accompanied it to support this view. Article IV(a), for example, provides in part that "the Governor of the sending State may disapprove the request for temporary custody or availability, either upon his own motion or upon motion of the prisoner." The report explains that this provision preserves "a Governor's right to refuse to make a prisoner available (on public policy grounds) . . . ." Council of State Governments, Suggested State Legislation, Program for 1957 at 78 (1956). These statements made sense with respect to state-to-state transfers, because prior to the adoption of the agreement governors had the power to deny another state's request for extradition. However, these statements do not make sense with respect to federal-state[4] transfers, since states apparently have always honored federal writs of habeas corpus *ad prosequendum. United States v. Kenaan, supra,* 557 F.2d at 916 n. 8; *United States v. Mauro,* 544 F.2d 588, 596 (2d Cir. 1976) (Mansfield, J., dissenting).

Article V(h) also illustrates that the Agreement was framed primarily to deal with the problems of the states. That provision states in part:

> From the time that a party State receives custody of a prisoner pursuant to this agreement until such prisoner is returned to the *territory* and custody of the sending State, the State in which the one or more untried indictments, informations, or complaints are pending or in which trial is being had shall be responsible for the prisoner and shall also pay all costs of transporting, caring for, keeping, and returning the prisoner.

(Emphasis added.) As I have explained, it does not make sense to speak of a return to the "territory . . . of the sending state" when that "state" is the United States.

government participates in a sending or receiving capacity.

Finally, the report which accompanied the Agreement when it was first proposed by the Council of State Governments stated flatly:

> [T]he only way that a prosecuting official can secure for trial a person already imprisoned in another jurisdiction is by resort to a cumbersome special contract with the executive authority of the incarcerating state. Because of the difficulty and red tape involved in securing such contracts they are little used. . . .
>
> [The Agreement] provides a method whereby prosecuting authorities may secure prisoners incarcerated in other jurisdictions for trial before the expiration of their sentences.

Council of State Governments, Suggested State Legislation, Program for 1957 at 78 (1956). These statements were true with respect to the states but incorrect with respect to the federal government, since the federal government had no trouble obtaining state prisoners for trial by means of writs of habeas corpus. *United States v. Kenaan, supra,* 557 F.2d at 916 n. 8; *United States v. Mauro,* 544 F.2d 588, 596 (2d Cir. 1976) (Mansfield, J., dissenting).

It is not hard to surmise why the Agreement was framed with state problems principally in mind: the drafting of the Agreement appears to have been dominated by organizations primarily concerned with state law. The process which led to the Agreement was set in motion in 1948 when the Council of State Governments appointed a committee "to consider possible solutions to problems caused by the placing of detainers." Council of State Governments, The Handbook on Interstate Crime Control 85 (1949 ed.). This committee, known as the Joint Committee on Detainers, consisted of three members from each of the following organizations: the National Conference of Commissioners on Uniform State Laws, the National Association of Attorneys General, the Association of Administrators of the Interstate Compact for the Supervision of Parolees and Probationers (each of the 45 party states appointed one administrator), the American Prison Association, and the Section on Criminal Law of the American Bar Association. *Id.* The Joint Committee adopted five "guiding principles" for dealing with the problems caused by detainers (*id.* at 88–89), but it failed to recommend specific legislation.

"During 1955 and 1956 the old Joint Committee on Detainers was informally reconstituted under the auspices of the Council of State Governments. . . ." Council of State Governments, Suggested State Legislation, Program for 1959 at 167 (1958). In addition, representatives from the following organizations were added: the National Association of County and Prosecuting Attorneys, the National Probation and Parole Association, and the Federal Bureau of Prisons. This expanded committee held three meetings and approved three specific pieces of proposed legislation developed by the Council of State Governments. *Id.;* New York State Legislative Annual—1957 at 42 (1957). The first two measures concerned purely *intra* state problems. The "Parole to Detainer Act" permitted state parole boards "to release prisoners on parole to answer warrants from other jurisdictions." Council of State Governments, Suggested State Legislation, Program for 1957 at 74, 76 (1956). A measure subsequently labelled the "Uniform Mandatory Disposition of Detainers Act"—and modelled on statutes enacted by California and Oregon—enabled a prisoner to secure disposition of detainers lodged by the state in which he was confined. Council of State Governments, Suggested State Legislation, Program for 1959 at 167 (1959); 9B Unif. Laws Ann. 1011. The third measure recommended by the Committee was the Interstate Agreement on Detainers. The draftsmen described that Agreement as an application of "the same principles embodied in the intrastate act to the interstate field." Council of State Governments, Suggested State Legislation, Program for 1957 at 78 (1956).

Not only did state problems dominate the drafting process, but during the first 14 years of its existence the Agreement governed only state-to-state transfers.

It would not be accurate to suggest, however, that the effect of the Agreement on the federal government was never considered from the beginning of the drafting process in 1948 to the enactment of the Agreement by Congress in 1970. The effect of the Agreement upon the federal government was occasionally considered, but for some reason its effect on the United States in a *receiving capacity* was never discussed. Virtually every reference to the United States mentioned the federal government in a sending capacity only. For example, in 1945 and again in 1959 the director of the Federal Bureau of Prisons wrote articles for the journal *Federal Probation* in which he described the problems caused by state detainers lodged against federal prisoners. Bennett, The Correctional Administrator Views Detainers, 9 Fed. Prob. 8 (1945); Bennett, "The Last Full Ounce," 23 Fed.Prob. 20 (1959). Similarly, during the early 1960s the Federal Bureau of Prisons urged Congress to make the United States a party to the Agreement so that state detainers filed against federal prisoners could be disposed of. Note, Convicts—the Right to a Speedy Trial and the New Detainer Statutes, 18 Rut.L.Rev. 828, 856 & n. 236 (1964). When the House and Senate Judiciary Committees issued reports on the Agreement in 1968 and 1970, those reports discussed the need for federal participation solely in terms of the effect which the Agreement would have on federal prisoners with outstanding state detainers. House Judiciary Committee, Enacting the Interstate Agreement on Detainers into Law, H.R.Rep. 1332, 90th Cong., 2d Sess. 3–4 (1968); House Judiciary Committee, Enacting the Interstate Agreement on Detainers into Law, H.R.Rep. 91–1018, 91st Cong., 2d Sess. 3 (1970); Senate Judiciary Committee Interstate Agreement on Detainers Act, S.Rep. 91–1356, 91st Cong., 2d Sess. [1970 U.S.Code Cong. & Admin.News p. 4866] (1970). The leading speeches in Congress took the same approach. 114 Cong.Rec. 11795 (1968) (remarks of Rep. Kastenmeier; only speech on bill); 116 Cong.Rec. 13999 (1970) (remarks of Rep. Kastenmeier); 116 Cong.Rec. 38841 (1970) (remarks of Sen. Hruska; only speech on bill).

I do not point to these facts to suggest that we should accept the government's argument that the United States became a party to the Agreement in a receiving capacity only. I note them only to explain why the impossibility of applying Article IV(a) to the federal government appears to have gone unnoticed. When the federal government acts in a sending capacity, the burden of complying with Article IV(e) falls upon the state which requests the federal prisoner, and when the states obtain federal prisoners for trial they apparently treat those transfers exactly as if they were state-to-state transfers. As a result, they do not seem to have any problems with Article IV(e). It is when the federal government acts in a receiving capacity that the problem of applying the Agreement to the federal government is posed in its starkest form.

### III.

I have attempted to show that the Interstate Agreement on detainers was designed to govern state-to-state transfers and that it is impossible to apply the literal language of that Agreement to the federal government. Corrective legislation is clearly needed to remedy the problems caused by federal participation in the Agreement. Until Congress acts, however, it seems to me that we must try to make as much sense out of the Agreement as we can. *See Commissioner v. Brown,* 380 U.S. 563, 571, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965).

This can be done best, in my view, by applying Article IV(e) in cases involving federal-state transfers precisely as it would be applied in cases involving analogous state-to-state transfers. State-to-state transfers which trigger Article IV(e) invariably have the following three characteristics. First, state boundaries are crossed. Second, a prisoner confined for violating the laws of one jurisdiction is taken to face charges under the laws of another jurisdiction. Finally, the affected prisoner is returned to a facility operated by the same

jurisdiction as the facility from which he was taken. Unless a federal-state transfer has these three characteristics, I would not hold that Article IV(e) has been activated.

A few examples will illustrate this point. Let us suppose that a state prisoner confined in a state prison in New York was brought to Newark, New Jersey, to face federal charges and then returned to the state prison in New York. In that situation I would hold that Article IV(e) had been triggered, because that transfer would be analogous to a transfer from a state facility in New York to a state courthouse in New Jersey to face state charges and then back to New York.

If a federal prisoner were taken from the Federal Correctional Institution in Danbury, Connecticut to a state courthouse in New Jersey and then back to Danbury, I would hold that Article IV(e) was triggered. *United States ex rel. Esola v. Groomes,* 520 F.2d 830 (3d Cir. 1975).[4a] That transfer would be analogous to a transfer from a state prison in Connecticut to a state court in New Jersey and then back to a state prison in Connecticut.

If a state prisoner were taken from the Philadelphia Detention Center, a state facility, to federal court in Camden and then back to the Philadelphia Detention Center, I would hold that Article IV(e) had been triggered. This holding may seem unwise from a policy standpoint. However, there is no question that Article IV(e) would be triggered if a state prisoner were transferred from the Philadelphia Detention Center to a *state* court in Camden and then back to Philadelphia. If Article IV(e) is triggered in the latter situation, I see no reason why it should not be in the former as well.

On the other hand, I would hold that Article IV(e) was not triggered in the two cases *sub judice* because state boundaries

were not crossed. Thus in the two transfers with which we are concerned, where both occurred within the Commonwealth of Pennsylvania and where neither would have triggered the Agreement if the federal government had not been involved, the Agreement should not be deemed to have been violated.

Similarly, if a *federal* prisoner was taken from a federal prison in Connecticut to face *federal* charges in New Jersey and then returned to the federal prison in Connecticut, I would hold that Article IV(e) was not triggered because the second characteristic of state-to-state transfers which trigger Article IV(e) was not present, i. e., the prisoner, having previously been convicted of offenses under *federal* law, was not brought to New Jersey to face charges *under the laws of another jurisdiction.*

I do not propose this construction of the Agreement as anything other than a stop-gap interpretation which can be applied until Congress takes corrective action and which will afford a workable analysis for the district courts in their future encounters with this legislation. But it seems to me that this interpretation is the best we can do at present, since we are constrained to apply to the federal government an act (the *Interstate* Agreement on Detainers) which was designed to govern *interstate,* not *intrastate* or federal-state,[5] transfers. The alternative to this interpretation is what the majority has done today, i. e., to dismiss indictments which the Agreement was never intended to affect and which are otherwise perfectly sound. The federal government simply is not a state, and the mere fact that it is defined as a "state" under the Agreement does not mean the provisions of the Agreement which were designed to apply to states can be applied to the United States in a rational way. Just

---

**4a.** *Esola* can be read as being limited to the precise context of a federal prisoner obtained by a state writ for state processing. That reading does no violence to the principle espoused in Judge Weis' dissent, which involves only the issuance of a writ by a federal authority seeking to obtain a state prisoner for federal processing.

**5.** And certainly not intra-city transfers as the majority holds in dismissing Thompson's indictment.

as a horse is not a bird, it cannot share a bird's characteristics, appearance, or attributes.[6] In like fashion, an airplane is not an automobile, and a statute which defines a plane as a "motor vehicle" could hardly be construed to make local traffic regulations applicable to that particular type of conveyance.

I would reverse the order of the district court dismissing the indictment in *United States v. Sorrell*, 562 F.2d 227, 3 Cir., and I would affirm the district court in *United States v. Thompson*, No. 76–1976. In neither case would I require the dismissal of the federal indictments at issue. I therefore dissent.

---

**6.** *But see* Memo of W. Barton Leach in Harv.L. Sch.Bull., April 1972, suggesting the following headnote for *Reg. v. Ojibway*, 8 Crim.L.Q. 137 (1965):

Is a pony, fortuitously saddled with a feather pillow, a "small bird" within the meaning of the Ontario Small Birds Act?

A pertinent portion of the text of *Reg. v. Ojibway*, construing a statute prohibiting the killing of small birds, reads:

Blue, J.: This is an appeal by the Crown by way of a stated case from a decision of the magistrate acquitting the accused of a charge under the Small Birds Act, R.S.O., 1960, c. 724, s. 2. The facts are not in dispute. Fred Ojibway, an Indian, was riding his pony through Queen's Park on January 2, 1965. Being impoverished, and having been forced to pledge his saddle, he substituted a downy pillow in lieu of the said saddle. On this particular day the accused's misfortune was further heightened by the circumstance of his pony breaking its right foreleg. In accord with current Indian custom, the accused then shot the pony to relieve it of its awkwardness.

The accused was then charged with having breached the Small Birds Act, s. 2 of which states:

2. Anyone maiming, injuring or killing small birds is guilty of an offence and subject to a fine not in excess of two hundred dollars.

The learned magistrate acquitted the accused, holding, in fact, that he had killed his horse and not a small bird. With respect, I cannot agree.

In light of the definition section my course is quite clear. Section 1 defines "bird" as "a two-legged animal covered with feathers." There can be no doubt that this case is covered by this section.

Counsel for the accused made several ingenious arguments to which, in fairness, I must address myself. He submitted that the evidence of the expert clearly concluded that the animal in question was a pony and not a bird, but this is not the issue. We are not interested in whether the animal in question is a bird or not in fact, but whether it is one in law. *Statutory interpretation has forced many a horse to eat birdseed for the rest of its life.*

(Emphasis added).