UNITED STATES of America, Plaintiff,

v.

Albert W. SCHRUM, Defendant.

UNITED STATES of America, Plaintiff,

v.

William G. GRIMES, Defendant.

UNITED STATES of America, Plaintiff,

v.

Basil Dickey STONE, Defendant.

UNITED STATES of America, Plaintiff,

v.

Stephen J. THOMPSON, Defendant.

UNITED STATES of America, Plaintiff,

v.

William K. VanWINKLE, Defendant.

Nos. 79–40031–01, 79–40035–01, 79–40034–01, 79–40033–01 and 79–40032–01.

United States District Court,
D. Kansas.

Jan. 4, 1980.

James P. Buchele, U. S. Atty., Robert S. Streepy, Asst. U. S. Atty., Topeka, Kan., for plaintiff.

Ira R. Kirkendoll, Larry E. Gregg, Ward D. Martin, John R. Mettner, Jr., Gerald J. Letourneau, Topeka, Kan., for defendants.

## ORDER

ROGERS, District Judge.

The above-captioned cases come before the court by reason of the several defendants' motions to dismiss indictments. Because the facts in each case are so similar, and the legal questions presented by the motions correspondingly akin, argument and decision on the motions has been consolidated.

In each case the defendant stands charged with criminal violations arising from the filing of false and fraudulent tax refund claims. Each defendant is presently incarcerated in the Kansas State Penitentiary at Lansing, Kansas, and was so incarcerated prior to November 6, 1979. On November 6, indictments were returned against defendants. Arrest warrants were issued the following day, November 7. On that day the United States Marshal's Office prepared detainer forms which, it appears, were lodged in the Records Office of the Kansas State Penitentiary.

On November 9, 1979, the United States Attorney filed petitions for writs of habeas corpus *ad prosequendum* in these cases, seeking to have defendants present for arraignment before the Magistrate on November 13. These writs were granted and defendants were transported by the United States Marshals from the Lansing institution to Topeka, Kansas, for arraignment.

They were returned to Lansing later that day; although kept in the Marshal's "holding cells" immediately before and immediately after their arraignment, defendants were not placed in institutional confinement during their brief stay in Topeka.

The same procedure was followed on November 20, 1979, when defendants were brought to Topeka by the Marshals for purposes of conducting omnibus hearings. Again defendants were returned to Lansing on the same day they were removed from state custody.

Defendants severally assert (in *pro se* motions supplemented by memoranda from their appointed counsel) that the facts recited above show a clear violation of the Interstate Agreement on Detainers Act, 18 U.S.C. Appendix, and specifically Article IV(e) of the Act, which reads:

> If trial is not had on any indictment, information, or complaint hereby prior to the prisoner's being returned to the original place of imprisonment ... such indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

The government has responded to the motions, and it consequently appears that certain matters pertaining to the construction of the Act are not in issue. Since the decision in *United States v. Mauro*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978), it must be conceded that: (1) the United States is a party to the Act and is a "receiving state" thereunder; (2) a detainer, once filed, brings the Act into play whereas a writ of habeas corpus *ad prosequendum*, standing alone, would not; and (3) the United States is bound by the agreement when it files both a detainer *and* a writ, since the writ in this setting is considered a "request" under the Act. It follows from this, and the government concedes, that the strictures of the Act are applicable to "interjurisdictional transfers" of prisoners from state to federal custody, and vice-versa, once a detainer has been lodged even though there may be no transfer across any state boundary. *See Mauro,*

*supra; United States v. Chico,* 558 F.2d 1047 (2d Cir. 1977), *cert. den.,* 436 U.S. 947, 98 S.Ct. 2850, 56 L.Ed.2d 788 (1978); *United States v. Thompson,* 562 F.2d 232 (3d Cir. 1977), *cert. den.,* 436 U.S. 949, 98 S.Ct. 2858, 56 L.Ed.2d 793 (1978); *United States v. Kenaan,* 422 F.Supp. 226 (D.Mass.1976), *rev'd on other gds.,* 557 F.2d 912 (1st Cir. 1977), *cert. den.,* 436 U.S. 943, 98 S.Ct. 2844, 56 L.Ed.2d 784 (1978); *United States v. Sorrell,* 413 F.Supp. 138 (E.D.Pa.1976), affirmed, 562 F.2d 227 (3d Cir. 1977), *cert. den.,* 436 U.S. 949, 98 S.Ct. 2858, 56 L.Ed.2d 793 (1978).

Thus, defendants argue, when they were taken from state custody and transported to Topeka after detainers were lodged, the express terms of the Interstate Agreement on Detainers Act commanded that they be retained in federal custody until the charges against them were disposed of. This is the view taken in *Thompson, supra,* by the Third Circuit. In *Thompson* the defendant was incarcerated by the State of Pennsylvania and, as in the present cases, removed to federal custody for less than one day for purposes of arraignment. The Court held (562 F.2d at 235) that the Act prescribed mandatory sanctions which should not be discarded by judicial legislation just because the result would be unjust or not in keeping with the perceived purposes of the Act. Although *Thompson* would today be decided differently in light of *Mauro* due to the absence of an actual detainer (the Third Circuit had held the writ of habeas corpus to be its functional equivalent under the Act), it can still be read to stand for the proposition that once the Act *is* applicable its commands must be followed precisely.

The government, on the other hand, urges this court to adopt the reasoning of *United States v. Chico, supra.* In *Chico* there was likewise removal from state custody for short periods of time, with return of the defendants to state custody on the same day. The Second Circuit, faced with the argument that the charges should be dismissed, looked first to the purpose of the Act (elimination of uncertainty with regard

to pending charges, minimization of interruption of rehabilitative programs) and observed that the Act's sanctions were not necessary to curb any abuse when the removal from custody is of short duration. The court then interpreted the phrase "returned to the original place of imprisonment" in Article IV(e) of the Act to imply the necessity for alternate imprisonment in the receiving "state," and held the Act inapplicable where a prisoner is removed "without ever being held at any place of imprisonment." *Id.*, 558 F.2d at 1049.

The question that faces us, then, is whether we should adopt the approach of the Third Circuit, and apply the terms of the Act strictly as written, or the approach of the Second Circuit, and imply an exception to the Act for removals of short duration which do not seriously interrupt the life of the prisoner in the sense that he is "re-incarcerated" in another institution during his removal. This question is made all the more difficult by the fact that most cases on the subject have dealt with the connected question whether a writ of habeas corpus, absent a detainer, can trigger applicability of the Agreement. In neither *Thompson* nor *Chico* was an actual detainer involved. As we have noted, *Thompson* treated a writ alone as sufficient to bring the Act into play, a view since discredited in *Mauro.* In *Chico* there was no detainer, but the Court proceeded upon the presumption that a writ would make the Act applicable. In *Kenaan, supra*, the district court's dismissal of the indictment was reversed on the ground that there had been no detainer, and that a writ alone would not trigger the Act. This does not lead to the inescapable conclusion that the result would have been the same had a detainer actually been lodged. In *Sorrell, supra*, the dismissal of the indictment by the trial court was affirmed on the assumption that a writ was a "detainer." None of these cases confronted squarely the question of removal from custody for short periods when a detainer has in fact been lodged. Most of the litigation to date concerning the operation of the Act as between the federal government and a state has centered upon the applicability of the Act to a transfer effected by use of a writ of habeas corpus *ad prosequendum.* See *Gray v. Benson*, 443 F.Supp. 1284 (D.Kan.1978) & cases cited at 1289. Now that *Mauro* has laid this question to rest, we have been unable to locate a decision dealing squarely with the question which remains and which faces us here: when a detainer *is* lodged, what should be done in a "transitory custody" situation?

We may observe that this question need not arise in the typical case. After *Mauro*, if the federal government wishes to avoid raising questions under the Act and is certain of the prisoner's continued incarceration close at hand, it need only refrain from filing a detainer, relying instead upon the writ. Such a procedure could have been followed in these cases, and defendants could have no grounds for seeking dismissal. This fact leads the government to argue that, in view of the facts of the case, it would be inadvisable to follow the strict letter of the Act. It appears that the United States Attorney's office did not cause the detainers to issue, and never intended to use any means other than writs of habeas corpus to secure defendants' presence. Rather, the detainers were issued routinely by the United States Marshal, and knowledge of that fact did not reach the prosecutor until after defendants had been (once) removed and returned. The government argues, in effect, that this error by the Marshal's Office and the prosecutor's lack of "prescience" should be excused. We sympathize with the quandary in which the prosecutor has been placed. Yet just such an argument has been rejected by Judge Doyle of the District of Columbia in *United States v. Jones*, No. 62236–77 (4/4/79). In *Jones* the defendant was brought to the District of Columbia pursuant to a detainer and writ, but was returned to state custody prior to trial by a United States Marshal without the knowledge of the prosecutors:

Upon these premises the Government would have this Court recognize an exception to Section IV(e) of the Act based on administrative error . . . [t]his court is aware of no case interpreting the statute

which would allow for such an exception and it declines to so hold. Regardless of what federal agency executed the transfer of the prisoner out of the jurisdiction, the United States is ultimately responsible for the act and the United States Attorney cannot successfully plead that since the action was not taken by an official in its own office that the sanctions of the statute may not be applied. We too are reluctant to create such an exception whereby the filing of a detainer only triggers applicability of the Act when such filing is deliberate or is initiated by the prosecution. In addition to having no apparent basis in the statutory language with which we are here concerned, such an exception would require a determination of fact in each case as to whether the prosecutor intended a detainer to be filed, whether the filing of a detainer was necessary in a given situation, and when the existence of the detainer was made known to each party involved. It would appear the better approach is to enforce the terms of the Act regardless of where blame may lie for the filing of the detainer. As a practical matter it must be realized that a writ is not always an acceptable substitute for a detainer. There may be situations where the United States wishes to file a detainer, as where immediate prosecution is not planned unless requested by the prisoner or where state custody will or may terminate prior to the commencement of federal proceedings. Thus the prosecutor's decision as to how to command an accused's presence may be a matter of some tactical calculation; the filing of a detainer will not always be a "mistake," and we do not wish to adopt a rule which encourages after-the-fact litigation of the prosecutor's intent.

Thus we are faced with the stark choice between applying the Act by its terms, or finding some basis in the Act itself for allowing the government to avoid its sanctions, supporting that construction of the Act with inferences as to congressional intent. The rationale of *Chico* that there must be "imprisonment" in the receiving "state" is not terribly persuasive. Is the length of the federal "custody" to be deter-

minative? If so, what is the practical difference between a few hours' "custody" in a holding cell in the federal courthouse and the same few hours' "custody" in the county jail with which this court contracts for detention of longer duration? Has a prisoner who was taken from state custody in the morning and returned in the evening suffered any greater deprivation under the Act than one who is taken in the evening, is incarcerated overnight at the behest of federal officials, and returned the next morning after a brief appearance before a federal magistrate? The distinction drawn in *Chico* would apparently differentiate between these two situations based on the fact of actual incarceration in a penal facility, but the practical difference is truly negligible. Is the length of the journey significant? Defendants here traveled over sixty miles each direction. Defendant in *Thompson* traveled less than ten miles. It is not inconceivable that a journey of the magnitude enjoyed by defendants here could exceed in length that of an interstate transfer to which the sanctions of the Act would be clearly applicable. The problem with the approach in *Chico*, which relies so heavily upon the presumed intention of Congress, is that it demands either a balancing test, or a juggling act, in each case to determine the magnitude of the deprivation, or the type of custody in which the prisoner was placed, or the possible impact of the temporary removal upon various interests of the prisoner:

> The approach is deficient in several respects . . . sacrificing predictability and certainty, generating litigation, and forcing individual evaluation of each case. What if the defendant remains overnight in federal custody before his return to state prison? Must the state institution and the federal court be in the same city, or the same state? Judge Weiss' dissent in *Sorrell* and *Thompson* modified the *Chico* approach by applying the Agreement to federal transfers only when state lines are crossed. This interpretation permits predictability, but has no basis in the Agreement itself. . . .

Note, *The Interstate Agreement on Detainers: Defining the Federal Role*, 31 Vanderbilt L. Rev. 1017, 1052 (1978).

 Thus we conclude, reluctantly, that sense can only be made of the Act if it is enforced according to its terms and the indictments in the above-captioned cases dismissed. We are aware that such action in the cases before us contravenes good sense to some degree. Yet this is the case only because the Act itself is badly drafted and appears to have been enacted without sufficient forethought. And we must recall that today's result could be avoided by restraint in the issuance of detainers; to the extent our decision today encourages such restraint it is at least consistent with the purposes of the Act in preventing wholesale filing of detainers.

We are not pleased by this result, which imposes harsher sanctions upon the government for a trifling violation of a statute than follow from egregious violations of constitutional rights. Public opinion has long been adverse to "courts which turn criminals loose on minor technicalities," and the error committed here is the most minor and technical one imaginable. Yet we see no practical way to create an exception in these cases which would not have the effect of emasculating the valid purposes of the Act or at least rendering its effect questionable in nearly every case. It should not be the province of the courts to determine whether an accused is held for trial on the one hand, or released scot-free on the other, based upon its skill in evading the clear import of a congressional act which it is bound to follow. Such a determination would have nothing whatsoever to do with the merits of the case against the accused and little connection with the valid "rights" of the parties involved, although it would be difficult to make such a determination with a blind eye to such matters. While the decision we reach today would never see light were this court the master of federal legislation, we believe it comports with the clear language of the Interstate Agreement on Detainers Act, and that any deviation therefrom which might be seen as just and reasonable is the job of Congress, and not the courts.

The indictments in the above-captioned cases will be dismissed.

IT IS SO ORDERED.