746 A.2d 1046 (2000)
329 N.J. Super. 79
STATE of New Jersey, Plaintiff-Respondent,
v.
Wilbert ANGOY, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted February 15, 2000.
Decided March 6, 2000.
*1048 Ivelisse Torres, Public Defender, for defendant-appellant (Jay L. Wilensky, Assistant Deputy Public Defender, of counsel and on the brief).
John J. Farmer, Jr., Attorney General, for plaintiff-respondent (Melaney S. Payne, Deputy Attorney General, of counsel and on the brief).
Before Judges WALLACE, CUFF and LESEMANN.
*1047 The opinion of the court was delivered by LESEMANN, J.A.D.
Defendant was convicted and sentenced to life imprisonment with thirty years of parole ineligibility for the murder of his girlfriend, Patricia ("Patty") Service. The crime was particularly brutal: Patty was beaten about the head, strangled, and her body immersed in scalding water. The medical examiner testified that any or all of those injuries could have caused her death.
On appeal, defendant complains of the trial court's charge respecting the lesser offense of passion/provocation manslaughter and the admission of evidence of defendant's prior assault on Patty, to show motive for the murder. Defendant also claims his sentence was excessive. We find no merit in any of the arguments, and thus, we affirm.
Defendant was thirty-five years old and married, while Patty was twenty years old and unmarried at the time of the murder on December 26, 1994. Their intimate relationship had begun in or about January 1994. They had both worked at the same place and generally saw each other at least once or twice a week, sometimes spending the night together.
On the day of the murder, defendant had arranged to meet Patty at a restaurant parking lot in Englewood where he was to give her $300 for a car payment. The two met, and defendant told Patty that, because he was busy, he could not see her during Christmas week or on New Years Eve. According to defendant, Patty then suggested they spend some time together that day at a motel where they had stayed on other occasions. Defendant agreed and the two then drove to the motel, arriving sometime in the early afternoon.
Defendant testified that they entered their room and began kissing, but Patty seemed "cold" toward him. He asked her why and she responded, "I got you back." He asked her what she meant by that, and she added, "I hope that bitch (presumably referring to defendant's wife) realized that you're having sex now because I gave you gonorrhea."
Defendant said he "didn't believe her," but he then went into the bathroom with Patty, examined his penis and, "I saw there was yellow substance coming out of it." He said that made him "very, very, very angry." When asked if he then hit Patty, he replied, "evidently I guess so." He said, "The next thing I knew is Patty was laying on the floor."[1]
Defendant said he did not know how many times he had hit Patty. Patty was not moving, and he was unable to feel her pulse. He said he became "very afraid," that he did not "want to live anymore," but he then took a lamp cord and tied Patty's feet to her hand. He carried her to the bathroom, saying he "wanted to hug her and commit suicide." He put Patty into the tub, with running water subsequently determined to be approximately 150 degrees Fahrenheit. He stepped into the tub himself (he said with the intention of committing suicide) but got out because the water was so hot it burned through his boots.
Defendant then decided to visit and speak to a priest he knew. He drove to *1049 the priest's church in Irvington but, when he did not see the priest's car, he returned to the motel.
Defendant then called the police. Initially, he told them he had been out of the room for three or four hours and only found Patty in the tub upon his return. He persisted in that story for some time but eventually described how Patty had actually been killed. When one of the detectives asked him why he had killed Patty, defendant replied "cause the bitch gave me gonorrhea."
The Medical Examiner testified that Patty had suffered acute scalding over forty percent of her body. He said she had died from the scalding as well as from brain contusions due to blunt trauma and probably strangulation as well.
The jury found defendant guilty of knowing and intentional murder and rejected the argument that he should be found guilty only of passion/provocation manslaughter under N.J.S.A. 2C:11-4b(2). Since the prosecution had not sought the death penalty, the only question on sentencing was whether defendant should be sentenced to life imprisonment with thirty years of parole ineligibility, or to a flat term of thirty years during which he would not be eligible for parole, N.J.S.A. 2C:11-3b(1). In imposing the more severe sentence, the court stressed the brutal nature of the murder and concluded that the aggravating factors outweighed any mitigating factors.
On appeal, defendant submits the following arguments:
POINT ITHE TRIAL COURT FAILED TO ADEQUATELY INSTRUCT THE JURY AS TO THE DEFINITION OF PASSION/PROVOCATION MANSLAUGHTER BY REFUSING TO ADEQUATELY DEFINE "MERE WORDS" OR TO TAILOR THE INSTRUCTION TO FIT THE FACTS OF THE CASE.
POINT IITHE TRIAL COURT ERRED TO DEFENDANT'S GREAT PREJUDICE BY ADMITTING TESTIMONY CONCERNING A PURPORTED PRIOR BAD ACT, BY FAILING TO DELIVER A CONTEMPORANEOUS LIMITING INSTRUCTION TO THE JURY, AND BY FAILING TO EXCISE TESTIMONY SUGGESTING THAT THE DEFENDANT WAS MOTIVATED BY RACIAL PREJUDICE. (Partially Raised Below)
A. THE TRIAL COURT ERRED TO DEFENDANT'S GREAT PREJUDICE IN DEFERRING ITS LIMITING INSTRUCTION AS TO THE PURPORTED PRIOR BAD ACT. (Not Raised Below)
B. THE TRIAL COURT ERRED IN FAILING TO EXCISE RACIAL REFERENCES FROM THE PRIOR BAD-ACT EVIDENCE. (Not Raised Below)
C. THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF THE ALLEGED PRIOR BAD ACT BECAUSE SUCH EVIDENCE WAS NOT "CLEAR AND CONVINCING."
POINT IIITHE TRIAL COURT IMPOSED AN EXCESSIVE SENTENCE, NECESSITATING REDUCTION.

I
Defendant's objection to the charge respecting passion/provocation manslaughter has two aspects: first, he complains of the statement that "words alone do not constitute adequate provocation"; and second, he claims the court did not adequately tailor its charge to the facts of the case.
As to the first claim, we note that the court's language came directly from the Model Jury Charge entitled "Passion/Provocation." While that factor is not determinative, it is a persuasive argument in favor of the charge as delivered. See State v. Marshall, 148 N.J. 89, 241-42, 690 A.2d 1, cert. denied, Marshall v. New Jersey, *1050 522 U.S. 850, 118 S.Ct. 140, 139 L.Ed.2d 88 (1997).
Beyond that, we find nothing erroneous or prejudicial in the statement. It was included in the charge after the court had already discussed at some length the elements of passion/provocation manslaughter, and had described the kind of provocation which must underlie a finding of passion/provocation manslaughter. The entire statement reads as follows:
First you must determine whether the provocation was adequate. Whether the provocation is adequate essentially amounts to whether loss of self-control is a reasonable reaction to the circumstances. The provocation must be sufficient to arouse the passions of an ordinary person beyond the power of his control. For example, words alone do not constitute adequate provocation. On the other hand, a threat with a gun or a knife or a significant physical confrontation might be considered adequate provocation.
Defendant argues that the alleged provocation here did not consist of just "words alone." His argument is that the language of the victim, together with the observation he made in the bathroom, is what constituted adequate provocation. However, nothing that the trial court said was inconsistent with that proposition. The court did not tell the jury that defendant's claimed provocation consisted of "words alone." Read in context, it is clear that the statement of which defendant complains was simply provided as an "example" of what would not constitute adequate provocation. The statement is followed and balanced by an example of other acts which might constitute "adequate provocation."
The statement, in short, was correct. It did not tell the jury that defendant's alleged provocation consisted of "words alone," and there is no basis to conclude that the charge was prejudicial.
So too, while we agree it is always appropriate and sometimes mandatory to tailor a charge to the facts of a case, State v. Concepcion, 111 N.J. 373, 545 A.2d 119 (1988), we find no prejudicial failure to do so here. While the charge might have been more specific, the facts of the case and the claims of the State and the defense were quite clear. The legal principles governing the murder charge and the possible lesser included offenses were also relatively clear, and we do not believe the absence of greater specificity could have redounded to defendant's detriment. We find no error in the charge.

II
Defendant's second claim of error relates to the admission of evidence that defendant choked Patty, approximately one month before the murder. The evidence was admitted under N.J.R.E. 404(b) as relevant to the jealousy and possessiveness which the State claimed was defendant's motive for the murder.
N.J.R.E. 404(b) strictly limits the admissibility of "prior crimes" evidence. It provides:
Evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that he acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.
The evidence of defendant's prior assault on Patty was presented essentially by Patty's mother, Arlene Service, who testified both at a pretrial hearing and at the trial itself. Her testimony on both occasions was essentially consistent. Ms. Service said that one night in November 1994, she heard her daughter pounding on the back door of her house, screaming for *1051 her to open the door and saying that "Will [defendant] is beating me."[2] Ms. Service testified that after Patty came into the house, she was hysterical and told her mother that defendant had tried to drag her to his car, that she was afraid that defendant had a gun, and that he had previously threatened to shoot her. Patty also said defendant had been choking her and that, "I could not even breath. My eyes were coming out of my head ... my feet was off the ground." Ms. Service said that defendant had tried to enter the house and follow Patty, but she had blocked his passage. He then told Mrs. Service that he loved Patty but, "I had to do that. She was out with a white man, and I hate white men," because they called him a racial name.
Ms. Service said that as a result of the incident, Patty had bruises on her neck and had difficulty swallowing. Patty's co-workers also reported seeing such bruises, but neither Patty nor her mother reported the incident to the police or called a doctor.
In State v. Cofield, 127 N.J. 328, 338, 605 A.2d 230 (1992), the Court dealt with "other crimes" evidence under N.J.R.E. 404(b). It held that one seeking the admission of such evidence must satisfy four requirements: (1) the evidence of the other crime must be relevant to a material issue in the case being tried; (2) the evidence must be similar in kind and reasonably close in time to the offense charged; (3) the evidence of the other crime must be clear and convincing; and (4) the probative value of the evidence must not be outweighed by its apparent prejudice.
The first two elements of the Cofield test were clearly met here. The "other crime" was relevant to a material issue in the present matterdefendant's alleged motive. It was also similar in kind to the actual murder (both involved choking), and the two were reasonably close in timewithin approximately one month of each other. Defendant argues, however, that the evidence should have been rejected because it was not "clear and convincing," and he also claims it was unduly prejudicialparticularly because it was not "sanitized" before being presented to the jury.
We are satisfied that the State met the "clear and convincing" standard. The testimony of Patty's mother was consistent, detailed and specific. There is no reason to believe she simply concocted the entire November 1994 incident. The trial judge found the testimony credible, and he also found defendant's testimony explaining the incident non-credible. There is no reason for us to substitute our judgment for that of the trial judge concerning that entirely reasonable conclusion.[3]State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964).
We are also satisfied that the fourth Cofield test was satisfied, since the probative value of the evidence was not outweighed by any apparent prejudice. In arguing the contrary, defendant stresses the failure to "sanitize" the evidence before its admission, by deleting his alleged racial comments. He says that if the rationale for admission of the statement was to show his jealousy and possessiveness as a motive for the murder, that could have been done without including the racial comments which had the capacity to prejudice *1052 him in the eyes of the jury. We find the argument unpersuasive.
At trial, defendant made no request for any such "sanitizing" of his statement. Thus, the claim of error must be judged on the "plain error" standard, R. 2:10-2, and defendant must show that the alleged error was "clearly capable of producing an unjust result." R. 2:10-2; State v. Copling, 326 N.J.Super. 417, 431, 741 A.2d 624 (App.Div.1999).
Had defendant requested excision of the racial reference, that could easily have been accomplished. That counsel did not make such a request suggests he may well have regarded the language as insignificant, which we think was the case.
This matter had no racial aspects. It is highly unlikely that the almost incidental racial comment would have achieved such significancegiven the overall facts of the caseas to prejudice defendant in any way. Defendant has not demonstrated any such prejudice, and has not shown that the alleged error was "clearly capable of producing an unjust result."
The admissibility of evidence under N.J.R.E. 404(b), is generally a matter for the trial court's discretion. "Appellate courts generally defer to trial court rulings on the admissibility of evidence of other crimes, unless those rulings constitute an abuse of discretion." State v. Erazo, 126 N.J. 112, 131, 594 A.2d 232 (1991). There was no abuse of discretion here.

III
Whenever evidence is admitted under N.J.R.E. 404(b), for one of the purposes specified in the rule, the jury must be instructed as to the limited purpose of the evidence and the restricted significance they can attach to it. State v. Marrero, 148 N.J. 469, 495, 691 A.2d 293 (1997); see also N.J.R.E. 105. The court's limiting instruction "should be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence." State v. Cofield, supra, 127 N.J. at 341, 605 A.2d 230.
Here, the court delivered a limiting instruction which properly outlined the purpose for which it had admitted evidence of the November assault. It also told the jury it could not consider that evidence for any broader purpose. Defendant does not claim the instruction was inadequate. He claims error because the instruction was given only as part of the court's final charge to the jury, rather than immediately after receipt of the evidence, which was approximately two weeks earlier. Here too, however, the issue was not raised at trial, and thus defendant can prevail on it only by demonstrating "plain error." See discussion supra.
Neither the Rules of Evidence nor case law in this State dictates that a limiting instruction respecting N.J.R.E. 404(b) must be delivered at the time the evidence is received rather than as part of the court's final charge to the jury. See State v. Hummel, 132 N.J.Super. 412, 424, 334 A.2d 52 (App.Div.), certif. denied, 67 N.J. 102, 335 A.2d 54 (1975), where the court held that a limiting instruction concerning "fresh complaint testimony" need not have been provided when the evidence was admitted, but could be included in the court's final jury charge.
Here, the court's final instruction was accurate, clear and comprehensive. There is no reason to believe the two week delay would lead either to the jury's disregarding that instruction or to prejudice against the defendant. That is particularly so, given the overwhelming evidence against defendant.
Nevertheless, while we find no prejudice and no basis for reversal, we emphasize that, in addition to its inclusion in the final jury charge, a prompt delivery of limiting instructions, either before, simultaneously *1053 with, or immediately after, the admission of other crimes evidence is preferable, andunless there is some compelling reason to do otherwiseshould be standard procedure followed by trial courts in all cases.

IV
Defendant's claim that his sentence was excessive does not require substantial discussion. The court found that the aggravating factors outweighed the mitigating factors. Among the aggravating factors, the court focused on the brutality of the crime, characterizing it as "cruel, heinous, senseless, [and] heartless." It referred to defendant as having almost killed Patty in three different ways, each of which might have been sufficient to cause her death.
Given those factors, it is difficult to conceive of mitigating factors which could have equaled the aggravating factors. In fact, the mitigating factors were virtually non-existent and the court's determination to impose a life sentence with thirty years parole ineligibility, rather than the only other possible sentencethirty years imprisonment without parole eligibilitywas more than justified. There is no basis for our interfering with the sentence imposed. State v. Ghertler, 114 N.J. 383, 387-88, 555 A.2d 553 (1989); State v. Roth, 95 N.J. 334, 363-66, 471 A.2d 370 (1984).
Affirmed.
NOTES
[1] Defendant acknowledged that he had venereal disease on three prior occasions, each of which had been readily cured by seemingly routine treatment.
[2] At the pretrial hearing, Ms. Service quoted her daughter as saying Will was "beating me." At trial, she used the words, "Will is trying to kill me."
[3] Defendant submitted an entirely different version of the November incident. He said he had gone to Patty's house at her request, and she arrived shortly thereafter driven by a male friend named LaSalle. He said he thanked LaSalle for bringing Patty home, but after he left, Patty threatened to commit suicide. To prevent that, he had grabbed her and carried her into the house. He denied choking or hurting Patty. The explanation seemed bizarre, and it is not surprising that the trial judge rejected it.