945 A.2d 723 (2008)
400 N.J. Super. 28
STATE of New Jersey, Plaintiff-Respondent
v.
Forrest M. BAKER, Sr., Defendant-Appellant.
No. A-6018-05T4
Superior Court of New Jersey, Appellate Division.
Argued January 16, 2008.
Decided April 14, 2008.
*725 Jacqueline E. Turner, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Ms. Turner, on the brief).
Jason D. Saunders, Assistant Prosecutor, argued the cause for respondent (Robert D. Bernardi, Burlington County Prosecutor, attorney; Mr. Saunders, on the brief).
Before Judges AXELRAD, SAPP-PETERSON and MESSANO.
The opinion of the court was delivered by MESSANO, J.A.D.
Defendant Forrest M. Baker, Sr. was charged in Indictment XXXX-XX-XXX with robbery in the first degree, N.J.S.A. 2C:15-1(a), and using a juvenile to commit a crime in the first degree, N.J.S.A. 2C:24-9(a). The juvenile in question was his son, M.B., thirteen years old at the time.[1] Defendant was found guilty of both counts after a jury trial and the State moved for an extended term of imprisonment pursuant to the "Three Strikes Act," N.J.S.A. 2C:43-7.1. After granting the State's motion, the trial judge imposed a mandatory life sentence without parole on the first-degree robbery, and a concurrent sentence of fifteen years, seven and one-half years without parole, on the second count. The judge ordered these sentences to run consecutively to a federal sentence defendant was already serving. All appropriate fines and penalties were also imposed.
On appeal, defendant raises the following issues for our consideration:
POINT I
THE TRIAL JUDGE ERRED IN DENYING [] DEFENDANT'S MOTION TO DISMISS THE CHARGES, AS THE VIOLATION OF THE INTERSTATE ACT ON DETAINERS MANDATED DISMISSAL.
POINT II
THE TRIAL JUDGE ERRED IN ADMITTING EVIDENCE OF UNRELATED ROBBERIES. IN ADDITION, *726 THE CURATIVE CHARGE TO THE JURY WAS INADEQUATE (Partially Raised Below).[2]
POINT III
THE DEFENDANT'S SENTENCE IS EXCESSIVE.
We have considered these contentions in light of the record and applicable legal standards. We affirm.

I.
At approximately 4:00 p.m. on June 29, 2002, Matilda Dodson, the assistant manager of the Rite Aid store in Mount Laurel, was near the cash register when she was approached by a teenage boy who removed a gun from under a newspaper and announced a robbery. Dodson told him to take what he wanted from the register as she moved to the back of the store to tell the other employees what was occurring. The young man took approximately $200 from the register and left. Dodson called the police.
The robbery went unsolved for several months until M.B., in the company of his aunt and uncle, came to the Mount Laurel police station. M.B. was advised of his Miranda[3] rights and provided a detailed statement implicating himself and defendant in the robbery. M.B. claimed that defendant gave him the gun and threatened him with death unless he committed the robbery. He also implicated defendant in other unsolved bank robberies in the area.
A federal arrest warrant was issued for defendant, and a search warrant was also issued for his residence, his mother's residence, and his car. The search of the vehicle resulted in the seizure of a fake mustache, a bank card in defendant's name, and a .45 caliber pellet gun that was described at trial as "very realistic."
Agents of the Federal Bureau of Investigation (FBI) arrested defendant and questioned him at their Cherry Hill offices. After defendant was administered his Miranda rights, he admitted that on June 28, 2002, while his son was in the car, he robbed the Equity Bank in Cherry Hill. He further claimed that he returned to the car with a pillowcase full of money and gave it to M.B. to hold. However, a dye pack in the money exploded, and defendant told M.B. to throw the pillowcase and the proceeds of the robbery out of the vehicle, which he did.
Members of the Mount Laurel police department also questioned defendant about the robbery of the Rite Aid. Although he initially told the police he did not tell his son to rob the store, defendant later acknowledged that "he may have dared him to do it, but he d[id] not recall telling him, or . . . threatening him to go commit the robbery." Defendant also acknowledged knowing that M.B. had in fact committed the Rite Aid robbery.
At trial, M.B. testified that defendant told him as they drove to the Rite Aid that they "didn't have any money and [they] needed money." Defendant told M.B. that he should "go in and rob the Rite Aid," and told him where he would be waiting with the car. M.B. claimed defendant gave him the gun and the newspaper, that he felt threatened by defendant, was afraid of him, and believed he had to commit the robbery. After leaving the Rite Aid, M.B. testified that he returned to the waiting car and gave defendant the money. *727
Based upon the judge's earlier ruling that we discuss in greater detail below, M.B. was permitted to testify about his knowledge of defendant's robbery of the Equity Bank the day before the Rite Aid robbery. According to M.B., he drove to the bank with his father who was wearing some sort of disguise and was carrying the same gun M.B. was to use the following day. Defendant entered and robbed the bank, returned to the car and gave M.B. a pillowcase full of money. As they drove away, a red dye pack exploded, M.B. began to cough and sneeze, and defendant told him to throw the bag out of the car window. He did.
Defendant did not testify at trial, however, his mother was called as a defense witness. She testified that defendant's three children lived with her sporadically, described M.B.'s troubled relationship with his father and noted that on occasion M.B., who had impulse control problems, had taken his father's car without permission. Defendant's fifteen year-old daughter, B.B., and his fourteen year-old son, E.B., were also called as defense witnesses, though neither provided any relevant or exculpatory information. Both denied telling defendant's investigator that M.B. had admitted committing the Rite Aid robbery by himself. The defense rested after calling investigator Annie Prochorencko, who testified that she interviewed B.B. and the girl told her that M.B. 1) "had done [the robbery] himself"; 2) had taken defendant's car "while [he] was sleeping"; and 3) had "blamed defendant because he was afraid of the consequences to himself."

II.
Defendant first argues that the trial judge erred in denying his pre-trial motion to dismiss the indictment based upon the State's alleged violation of the Interstate Agreement on Detainers (the IAD), codified in New Jersey at N.J.S.A. 2A:159A-1 to -15. Alternatively, he argues we should remand the matter to the trial court for a plenary hearing on the issue.
At oral argument on his pre-trial motion, defendant claimed that during the months after he commenced his federal sentence, he was "shuttled back and forth between the federal prison and the Burlington County Jail, where he was facing the[se] state charges[.]" He claimed he would periodically be returned to the federal facility "to await the next state proceeding, whether for a plea discussion or motions." He argued that this conduct violated N.J.S.A. 2A:159A-4(e) and required dismissal of the indictment.
The State argued that the IAD had never been "triggered." It noted that defendant did not request to be brought before the court for disposition of the charges as permitted by N.J.S.A. 2A:159A-3. More importantly for purposes of this appeal, the prosecutor argued below "that each time [defendant] was brought in he was brought in on a writ at the request of the [c]ourt not at the request of the [e]xecutive [b]ranch or the [p]rosecuting agency. . . . The IAD simply was not implicated there."
The judge concluded
The IAD was not triggered here. . . . [A]lthough he's on a Federal reservation, he's still within the jurisdiction of this Court, so, therefore, there is no need for an IAD. I can reach out and touch him any time I want to as long as he's physically in New Jersey.
The judge denied the motion to dismiss and reaffirmed the scheduled trial date of January 6, 2006. Thereafter, defendant was produced for his trial pursuant to the court's order to produce him, was apparently returned to federal custody to await his sentence date, and once again produced *728 before the trial judge on February 17, 2006 for the imposition of sentence.
Defendant has reiterated this argument on appeal. Before turning to its merits, we dispatch with the alternative suggestion defendant has made, specifically that the matter be remanded for a plenary hearing to determine exactly how he was produced from the federal facility for the several appearances he made before his trial commenced. We view the request as unnecessary.
The undisputed record reveals that on July 16, 2003, defendant pled guilty to five federal bank robbery charges and was sentenced on November 25, 2003, to an aggregate sentence of seventy-eight months. On January 6, 2004, he began serving that sentence at the federal correctional facility at Ft. Dix in Wrightstown.
The State asserts that defendant was produced before the trial judge on each occasion as the result of the judge's "orders to produce." In its brief, the State attached sixteen such orders, the first dated July 28, 2003, while defendant was housed in the federal detention center in Philadelphia, the last ordering that defendant be produced for his sentence on February 17, 2006. Each order was requested by the criminal case manager and signed by the judge. Defendant does not offer any proof to the contrary and acknowledges in a detailed pro se certification he filed in support of the motion that he was produced before the trial judge by use of a "Writ of Habeas Corpus ad Prosequendum." In short, the record that exists indicates clearly that defendant was repeatedly brought before the judge based upon the court's orders to produce him. We discern no requirement for a more extensive record on the issue and we turn instead to the merits of defendant's argument.
Initially, we agree with defendant that the trial judge was mistaken in his belief that the IAD was inapplicable because defendant was a federal prisoner housed in New Jersey and not another state. The definitional portion of the statute, N.J.S.A. 2A:159A-2(a), makes it clear that as used in the IAD, "state" means "a State of the United States; the United States of America; a territory or possession of the United States; the District of Columbia; the Commonwealth of Puerto Rico."
In United States v. Thompson, the Third Circuit concluded that the IAD applies "where the Federal Government is trying a state prisoner serving his state sentence within the geographical limits of the state in which the federal district court is located." 562 F.2d 232, 234 n. 2 (3d Cir.1977) (citing United States v. Sorrell, 413 F.Supp. 138, 140-41 (E.D.Pa.1976), cert. den., 436 U.S. 949, 98 S.Ct. 2858, 56 L.Ed.2d 793 (1978)); see also United States v. Schrum, 504 F.Supp. 23, 25 (D.Kan.1980) (holding "that the strictures of the [IAD] are applicable to `interjurisdictional transfers' of prisoners from state to federal custody, and vice-versa, once a detainer has been lodged even though there may be no transfer across any state boundary"), aff'd, 638 F.2d 214 (10th Cir.1981). Therefore, it did not matter that defendant was in federal custody in New Jersey and not physically in another state for purposes of the IAD.
However, the State argues, as it did below, that the IAD was never "triggered" because it never lodged a detainer against defendant nor moved pursuant to N.J.S.A. 2A:159A-4 to have him produced in state court for his trial. That section of the IAD provides in relevant part,
(a) The appropriate officer of the jurisdiction in which an untried indictment, information or complaint is pending shall *729 be entitled to have a prisoner against whom he has lodged a detainer and who is serving a term of imprisonment in any party State made available . . . upon presentation of a written request for temporary custody or availability to the appropriate authorities of the State in which the prisoner is incarcerated. . . .
* * * *
(c) [T]rial shall be commenced within 120 days of the arrival of the prisoner in the receiving State, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.
* * * *
(e) If trial is not had on any indictment, information or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment . . ., such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.
Defendant contends that even if the State never initiated the process of securing defendant's presence in state court by lodging a formal detainer and proceeding in accordance with § 4 of the IAD, the court's orders were the functional equivalent of a detainer and the remedy accorded by the statute  dismissal of the indictment  was appropriate since it is undisputed that defendant was not tried within the time limits of § 4(c) and the State never sought any extension of those limits for "good cause." See also N.J.S.A. 2A:159A-5(c) (providing for dismissal of any indictment if the time limits contained in § 4 are not met).
New Jersey, forty-seven other states, the District of Columbia, Puerto Rico, the Virgin Islands, and the United States are all signatories to the IAD. State v. Pero, 370 N.J.Super. 203, 206, 851 A.2d 41 (App.Div.2004) (citing Carchman v. Nash, 473 U.S. 716, 719, 105 S.Ct. 3401, 3403, 87 L.Ed.2d 516, 520 (1985)). Since the IAD is a "congressionally sanctioned interstate compact," the interpretation of the IAD "presents a question of federal law." Cuyler v. Adams, 449 U.S. 433, 442, 101 S.Ct. 703, 709, 66 L.Ed.2d 641, 650 (1981). Therefore, "[f]ederal court interpretations of the IAD . . . [are] binding upon state courts." Pero, supra, 370 N.J.Super. at 214, 851 A.2d 41.
The IAD undoubtedly serves several laudable goals from the perspective of an inmate in custody in another jurisdiction. We have noted that "[t]he intent and rationale" behind the act "was to counter the perceived evil when prosecutorial delay or inattention fail to provide a defendant incarcerated in another jurisdiction an opportunity for prompt disposition of charges" thereby "potentially prejudic[ing] a prisoner's opportunities and even his potential for concurrent sentences." Id. at 221, 851 A.2d 41. Additionally, focusing on the inmate's status within his own correctional facility, we have noted that "[t]he purpose of the IAD is to expedite outstanding charges in order to protect prisoners from the adverse consequences of detainers." Van Winkle v. New Jersey Dep't of Corr., 370 N.J.Super. 40, 46, 850 A.2d 548 (App.Div.2004) (citing Johnson v. Cuyler, 535 F.Supp. 466, 473 (E.D.Pa. 1982), aff'd, 714 F.2d 123 (3d Cir.1983) (applying New Jersey law)). One such adverse consequence is the "uncertaint[y]" produced by detainers "which obstruct programs of prisoner treatment and rehabilitation." N.J.S.A. 2A:159A-1; see Adams, supra, 449 U.S. at 449, 101 S.Ct. at 712, 66 L.Ed.2d at 654; United States v. Mauro, 436 U.S. 340, 360, 98 S.Ct. 1834, 1847, 56 L.Ed.2d 329, 347 (1978) (noting that "[b]ecause a detainer remains lodged *730 against a prisoner without any action being taken on it, he is denied certain privileges within the prison, and rehabilitation efforts may be frustrated").
Whether that was the specific purpose behind the enactment of the "anti-shuttling" provisions of § 4 of the IAD, however, is less clear. In rejecting the state of Alabama's argument that a one-day shuttle from federal prison to state court was de minimis because it did not interrupt any rehabilitative efforts, and thus did not violate the purpose of § 4, the United States Supreme Court noted
[T]he [IAD's] drafters may have thought that the "shuttling" itself, i.e., the movement back and forth among prisons, adds to the `uncertainties which obstruct programs of prisoner treatment and rehabilitation'. . . . And they may have sought to minimize the number of "shuttles" for that reason alone. . . . But we need not decide precisely what led Congress and the many other legislatures to agree to [§ 4]'s anti[-]shuttling remedy. [Alabama v. Bozeman, 533 U.S. 146, 155-56, 121 S.Ct. 2079, 2086, 150 L.Ed.2d 188, 197 (2001) (emphasis omitted)].
We, too, need not determine whether § 4's purpose was to assure that any rehabilitative efforts taking place in defendant's federal institution were not thwarted, or that defendant did not suffer the denial of privileges as a result of his frequent appearances before the trial judge. We note, however, that defendant has certainly brought no such consequences to our attention.[4]
The reason why defendant's argument is unavailing is found in the express language of the IAD. We have held that the statute is only triggered if the State has filed a detainer with the custodial state in the first instance. State v. Burnett, 351 N.J.Super. 222, 226, 798 A.2d 96 (App.Div. 2002). Here, since the State never filed a detainer with the federal correctional authorities, our inquiry would seem ended. Defendant asserts, however, that the judge's orders to produce him from federal custody were the functional equivalent of a detainer under the IAD and therefore triggered § 4's protections against "shuttling."
Although the term "detainer" is not defined in the IAD, the United States Supreme Court has held that it is "a request filed by a criminal justice agency with the institution in which a prisoner is incarcerated, asking the institution either to hold the prisoner for the agency or to notify the agency when release of the prisoner is imminent." Carchman, supra, 473 U.S. at 719, 105 S.Ct. at 3403, 87 L.Ed.2d at 520. In Mauro, supra, the Court held unequivocally that "a writ of habeas corpus ad prosequendum is not a detainer for purposes of the [IAD]." 436 U.S. at 361, 98 S.Ct. at 1848, 56 L.Ed.2d at 347; see also Diggs v. Owens, 833 F.2d 439, 443 (3d Cir.1987) (holding that prisoner's transfer of custody to state prosecuting authorities pursuant to writ of habeas corpus ad prosequendum did not trigger the provisions of the IAD), cert. denied, 485 U.S. 979, 108 S.Ct. 1277, 99 L.Ed.2d 488 (1988); United States v. Marzgliano, 588 F.2d 395, 397 (3d Cir.1978). In part, the Court's ruling was based upon the fact that the statutory authority for the federal courts to issue such writs, 28 U.S.C.A. 2241(c)(5), existed long before Congress adopted the IAD, thereby implicitly excluding writs of habeas corpus ad prosequendum from the term "detainer." Mauro, supra, 436 U.S. at *731 357-61, 98 S.Ct. at 1846-48, 56 L.Ed.2d at 345-47. New Jersey similarly has provided courts with long-standing statutory authority to produce prisoners for purposes of standing trial, at least within the jurisdictional bounds of the issuing court. See N.J.S.A. 2A:67-4(d)(permitting removal of prisoner "for his trial or discharge in due course of law").[5]
However, in Mauro, the Court also noted that if a detainer has in fact been lodged against a prisoner, the use of a writ of habeas corpus ad prosequendum to produce him was the equivalent of the government's "written request for temporary custody" pursuant to § 4 of the IAD, thus triggering the statute's time limits. Mauro, supra, 436 U.S. at 362, 98 S.Ct. at 1848, 56 L.Ed.2d at 348. Since Mauro, it would appear that the federal courts have unanimously followed this "writ plus" test to determine whether the provisions of the IAD are triggered, though there exists some debate as to whether the additional law enforcement action taken in the particular factual circumstances presented was the functional equivalent of a detainer.[6]
The decisions of the courts in our sister states also support the conclusion that the production of a prisoner before a state court pursuant to a writ of habeas corpus ad prosequendum, standing alone, is insufficient to trigger the provisions of the IAD's anti-shuttling provision. For example, in People v. McLemore, 411 Mich. 691, 311 N.W.2d 720 (1981), a case that is factually similar to the one at hand, the defendant was produced from a federal detention center in Michigan for an appearance on state charges in Detroit pursuant to a writ of habeas corpus ad prosequendum. Id. at 721. The Michigan Supreme Court concluded that a decision by federal authorities to honor a writ of habeas corpus ad prosequendum as a matter of comity does not trigger the IAD. Ibid.
Likewise, in People v. Hines, 817 P.2d 559 (Colo.Ct.App.1991), another factually similar case, the defendant sought dismissal of his state charges after being produced from a federal correctional facility in Colorado, and returned three times, prior to final disposition. Id. at 560. Finding Mauro to be "dispositive," the court denied the defendant's challenge. Id. at 561. See also Shanks v. Commonwealth, 574 S.W.2d 688, 690 (Ky.Ct.App.1978) (holding a writ is not a detainer).
However, like their federal counterparts, some state courts have utilized the "writ plus" test and concluded that the anti-shuttling provisions of the IAD were triggered despite the lack of any formal detainer. See Runck v. State, 497 N.W.2d 74, 80 (N.D.1993) (holding a writ plus other documents used to transfer federal prisoner to state court were sufficient to trigger *732 IAD); Finley v. State, 295 Ark. 357, 748 S.W.2d 643, 645 (1988) (holding that court order requiring sheriff to make arrangements for the transfer of the defendant from federal to state custody constituted a detainer for purposes of the IAD); Commonwealth v. Wilson, 399 Mass. 455, 504 N.E.2d 1060, 1065 (1987) (holding the issuance of a writ after the lodging of a detainer on other charges was sufficient to trigger the IAD); but compare State v. Williams, 253 Neb. 619, 573 N.W.2d 106, 111-12 (1997) (concluding a state writ used to produce a defendant from federal custody was not a detainer triggering the IAD despite the federal institution's receipt of a state arrest warrant and forms utilized under the IAD).
In this case, it is undisputed that the State never filed an actual detainer against defendant while he was housed in any of the federal correctional facilities. Additionally, defendant has not marshaled any evidence that would support the conclusion that anything other than the trial court's orders were ever used to produce him in court in Burlington County, or that any other document was ever "filed" with the federal authorities to preserve the opportunity to do so in the future. Therefore, we find the United States Supreme Court's holding in Mauro to be dispositive of the issue presented here. The orders to produce were not the functional equivalents of detainers for purposes of the IAD and defendant's pre-trial motion to dismiss for an alleged violation of § 4 of the IAD was properly denied.

III.
Defendant's next point is actually two-fold. First, he contends the judge erred when he permitted the State to introduce any evidence of the prior bank robbery over defendant's objection. Second, defendant contends that the judge's limiting instruction was not given when the evidence was admitted, and that the instruction given in the final jury charge was inadequate and erroneous. In this regard, defendant neither requested an interim instruction, nor objected to the final charge as given. Therefore, as to this sub-issue, we must review the contention and assess whether it was plain error. R. 2:10-2.

A.
Before the jury was selected, the judge conducted a hearing to determine the admissibility of defendant's statement to the FBI and his subsequent statement made the same day to Mount Laurel police personnel. Neither statement was recorded nor reduced to writing.
FBI agent Kevin Burton testified that defendant admitted committing the Equity Bank robbery on June 28, with M.B. present, and he acknowledged that the dye pack exploded and he told M.B. to discard the money and pillowcase. Investigator Edward Pincus of the Mount Laurel police department testified that defendant admitted being present at the Rite Aid with M.B., but denied having anything to do with the robbery. Defendant did not recall threatening M.B. to commit the crime, but said he "may have dared his son to do it." Defendant claimed that M.B. came out of the store with the money, returned to the car with it, but that he did not know what M.B. did with the proceeds.
After ruling the statements were admissible under Miranda, the judge inquired whether the State intended to offer any other evidence in support of its N.J.R.E. 404(b) application to admit testimony regarding the earlier bank robbery. The prosecutor noted "there is a statement by the juvenile. . . . If your honor is inclined I could call that witness." Before breaking for lunch, the judge responded, *733 "that's your call as to whether . . . you want to supplement the testimony that was . . . given here." After the recess, the prosecutor advised the judge that he "would rely on the testimony of [the FBI agent] regarding the comments that defendant made to him about that June 28th robbery." M.B. was not called as a witness at the hearing.
In seeking to admit the evidence of the prior robbery, the prosecutor contended
Any argument regarding that the defendant did not know that the juvenile was going in to commit the robbery at the Rite Aid is certainly connected to the fact that the very day before the juvenile was in the car with the father when he committed a robbery and a die (sic) pack exploded. It's very demonstrative, very unique situation. The theory is . . . I'm showing you the ropes, son, and tomorrow is your turn. . . .
Defendant argued the evidence was not admissible to any "material issue" in the case, was not "clear and convincing," and its probative value was clearly outweighed by it prejudicial effect upon defendant.
The judge considered the issue in light of State v. Cofield, 127 N.J. 328, 605 A.2d 230 (1992). He found the evidence of the prior bank robbery to be relevant to the "material issue" of defendant's intent and whether "there was knowledge or a plan in the robbery of the Rite Aid." The judge found the two robberies to be "similar in kind," both being first-degree robberies involving defendant and M.B., and "close in time," being one day apart. The judge found the evidence of the prior robbery to be "clear and convincing" because defendant had been convicted of the bank robbery. Lastly, the judge determined the evidence of the prior robbery was "very prejudicial" to defendant, however, he concluded that its probative value outweighed that prejudice.
We note first that defendant lodged no objection to M.B.'s testimony regarding the June 28 bank robbery. Therefore, we consider the argument solely as it has now been raised  that any testimony regarding the prior robbery was inadmissible under N.J.R.E. 404(b). We reject this contention substantially for the reasons expressed by the trial judge.
Defendant contended in his statement to the police that he did not know M.B. was going to commit the robbery; he implied that though he may have dared M.B. to do so, he did not intend for him to rob the Rite Aid. He also claimed that he did not know what M.B. did with the proceeds of the robbery certainly implying that he had no intention himself of committing the robbery. Through the defense witnesses, defendant sought to support this claim by asserting that M.B. had essentially committed the crime himself without the support, or possibly even the presence, of defendant. Thus, a material issue in dispute was defendant's knowledge of M.B.'s actions and his intent to participate in the Rite Aid robbery. Therefore, evidence that tended to prove that one day earlier the same father and son were together committing another robbery, utilizing the same weapon and the same vehicle, was highly probative because it demonstrated a shared purpose and negated defendant's claims of lack of knowledge and intent. We therefore find no error in its admission.

B.
Defendant's second argument regarding the N.J.R.E. 404(b) evidence is that the judge erred in not providing an immediate limiting instruction when the evidence was received by the jury, and that the judge's final limiting instruction was erroneous because it allowed the jury *734 to use the evidence for an impermissible purpose. Since defendant never requested an immediate limiting instruction, and did not object to the charge as given, we consider whether the alleged error amounts to plain error. State v. Afanador, 151 N.J. 41, 54, 697 A.2d 529 (1997); R. 2:10-2.
"In the context of a jury charge, plain error requires demonstration of `[l]egal impropriety . . . prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" State v. Burns, 192 N.J. 312, 341, 929 A.2d 1041 (2007)(quoting State v. Jordan, 147 N.J. 409, 422, 688 A.2d 97 (1997) (citations omitted)). The allegation of error must be assessed in light of "the totality of the entire charge, not in isolation." State v. Chapland, 187 N.J. 275, 289, 901 A.2d 351 (2006). While an erroneous jury charge has been held to be a "`poor candidate[] for rehabilitation' under the plain error theory," Jordan, supra, 147 N.J. at 422, 688 A.2d 97 (citation omitted), we nonetheless consider the effect of any error in light "of the overall strength of the State's case." Chapland, supra, 187 N.J. at 289, 901 A.2d 351.
We have already noted that a judge should give a limiting instruction on the permissible uses of the N.J.R.E. 404(b) evidence when it is admitted. State v. Angoy, 329 N.J.Super. 79, 89-90, 746 A.2d 1046 (App.Div.), certif. denied, 165 N.J. 138, 754 A.2d 1214 (2000); see also State v. Blakney, 189 N.J. 88, 93, 912 A.2d 140 (2006)(noting "the better practice is to give limiting instructions not only at the time that other-crimes evidence is presented, but also in the final jury charge"). However, if the final charge is "accurate, clear and comprehensive," we have concluded any delay, even if two weeks have elapsed between the introduction of the evidence and the final instruction, is not plain error. Angoy, supra, 329 N.J.Super. at 89, 746 A.2d 1046. Here, the final jury charge was given one week after admission of the other crime testimony. Delay in giving the limiting charge, therefore, was not in and of itself plain error. We turn our attention to the adequacy of the final instructions since that is determinative of whether reversal is required.
The judge's instruction tracked the model jury charge and began by advising the jurors that evidence of the prior bank robbery would normally be excluded if it was introduced to show defendant "has a disposition or a tendency to do wrong and, therefore, must be guilty of the charged offense." He then proceeded to tell the jurors that if "satisfied that the defendant committed the other crime," they were permitted to use the evidence for "a certain specific narrow purpose." He continued
In this case, the evidence was introduced as to the issues of intent and motive. There was testimony presented that the defendant did not receive any proceeds from the bank robbery. There was also testimony that the Rite Aid Store was robbed so that the defendant and his son could get money. You may find that this evidence relates to the issues of intent and motive and may assist you in determining the issue of why the Rite Aid robbery took place.
Whether this evidence does, in fact, demonstrate intent and motive is for you to decide.
* * * *
However, you may not use this evidence to decide that the defendant has a tendency to commit crimes or that he is a bad person. . . . I have admitted the evidence only to help you decide the specific question of intent and motive. *735 You may not consider it for any other purpose. . . .
The judge distributed his charge in writing to the prosecutor and defense counsel before hand. The prosecutor specifically requested that the judge include "knowledge" as a permissible purpose for which the jury could use the evidence. As the prosecutor noted, "[p]art of the reason why [the evidence] was let in . . . is also for knowledge in that [in] defendant's statement to the investigators . . . [he] says I don't really have knowledge of what [M.B.] was about to go in and do. . . ." Defense counsel objected and stated, "I think the charge as written by the Court and as reviewed previous[ly] is sufficient." Thus, not only did defendant not object to the charge, he requested the judge not provide any instruction that the evidence could be permissibly used by the jury to demonstrate defendant's knowledge of what was about to occur at the Rite Aid store on the day of the robbery.
Defendant takes issue not with the propriety of the charge in a general sense. Rather, he argues that the judge told the jury it could consider the evidence as to "intent and motive," despite ruling earlier that it was admissible to demonstrate defendant's intent and knowledge of the plan to rob the Rite Aid. Relying upon our decision in State v. Mazowski, 337 N.J.Super. 275, 766 A.2d 1176 (App. Div.2001), defendant argues that by telling the jury they could use the evidence of the bank robbery to assess defendant's motive in robbing the Rite Aid store  so "defendant and his son could get money"  the judge permitted speculation as to defendant's "need for cash," thus fueling the jury's conclusion that defendant had a propensity for crime.
In Mazowski, we reversed defendant's burglary conviction because the repeated "reference to defendant's drug use violated the prohibition of N.J.R.E. 404(b) against using evidence of `other crimes' to demonstrate a propensity to commit further crime, and [ ] the evidence was not admissible as `proof of motive.'" Id. at 278, 766 A.2d 1176. We concluded that evidence of defendant's drug use and addiction as a motive for his constant need for money
[p]osed [an] extremely broad definition of `motive,' [] that [] does not relate to the particular crime with which defendant is charged, or to any other particular crime. Rather, it is . . . a reason why defendant commits crime in general. It is an undifferentiated `motive' to steal. As such, except for its label, it is indistinguishable from a claim that defendant has a `disposition,' or general propensity to commit crimes, which is precisely what N.J.R.E. 404(b) prohibits.
[Id. at 282, 766 A.2d 1176.]
While the better course may have been not to charge "motive" as a permissible use of the evidence in this case, we conclude it was not plain error to do so for a number of reasons.
First, we think the facts of this case are amply distinguishable from Mazowski. There, the trial judge permitted repeated and non-specific references to defendant's admitted drug abuse as evidence of his motive for committing the crime charged. Here, the other crime evidence was limited to just one incident, the bank robbery the day before, thus providing more focus for the jury and making it much less likely that the other crime evidence would lead to a conclusion that defendant had a "propensity" to commit crime. Additionally, the judge told the jury that the evidence could not be used for that purpose.
Second, given all the evidence adduced, the unusual facts of the bank robbery provided some context for the motive in robbing the Rite Aid. We acknowledge, as defendant argues, that every robbery has as its motive the desire to acquire money *736 or other things of value. However, because the bank robbery committed one day earlier in nearby Cherry Hill failed, defendant's desire to have his son rob the Rite Aid, as opposed to doing it himself, becomes more understandable. In a sense, under these unusual facts, the line between defendant's intent, clearly a material issue in dispute for which the N.J.R.E. 404(b) evidence was permissible, and his motive, for which its use was more questionable, begins to blur. See State v. Hernandez, 170 N.J. 106, 129, 784 A.2d 1225 (2001) (noting permissible use of "temporally proximate drug sales . . . to counter [defendant's] suggestion that [witness's] `motive' or `state of mind' in giving him money and his `motive' or `state of mind' in receiving it" were innocent and not criminal).
Lastly, given defendant's objection to the State's request to include in the charge "knowledge" as a permissible use of the other crime evidence, his failure to object to the charge as given, the judge's proper instruction that the evidence could be used to prove defendant's intent, and the overall strength of the State's case, we cannot conclude the charge was plain error.

IV.
Defendant's final argument is that the sentence imposed upon him was excessive. In particular, he contends the trial judge erred by ordering the sentence to run consecutively to his federal sentence because the string of bank robberies that were the subject of the federal charges and the Rite Aid robbery all occurred in close temporal proximity and while defendant was addicted to painkillers. We deem this argument to be of insufficient merit to warrant extensive discussion in this opinion. R. 2:11-3(e)(2). We add only the following brief comments.
In imposing the consecutive sentence, the judge noted he was doing so "pursuant to State v. Yarbough"[7] which "says that the sentence should be consecutive." While this analysis may have been cursory, we nonetheless conclude that the consecutive sentence was justified under Yarbough's analytical framework and was not "a clear error of judgment that [] shocks the conscience." State v. Megargel, 143 N.J. 484, 493, 673 A.2d 259 (1996).
Defendant committed this crime with his son who was not involved in the other robberies, save the one committed at the Equity Bank. The bank robberies involved occurred over a six-month period which we view as hardly being in temporal proximity to each other. Each robbery involved a different victim. In short, we find no abuse by the judge of the wide discretion accorded in determining the appropriate sentence.
Affirmed.
NOTES
[1] Because of his age, we refer throughout the opinion to defendant's son by the use of initials.
[2] Although defendant uses the plural, "robberies," in his point heading, it is clear that the judge permitted evidence of only one other crime as we discuss below.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] In the "declaration" he filed pro se in support of his motion to dismiss, defendant claimed, without any detail, his "rehabilitation efforts . . . [were] continuously being interrupted." That claim was not specifically renewed before us.
[5] Since the issue has not been raised, we do not consider the propriety of the federal authorities' decision to honor the order to produce defendant issued by a New Jersey superior court judge. Defendant has not argued that the court's orders to produce him in this case were somehow defective.
[6] See United States v. Roy, 771 F.2d 54, 59 (2d Cir.1985) (issuance of a writ followed by a detainer triggers the provisions of the IAD), cert. denied, 475 U.S. 1110, 106 S.Ct. 1520, 89 L.Ed.2d 918 (1986); United States v. Fulford, 825 F.2d 3, 10 (3d Cir.1987)(arrest warrant lodged prior to execution of the writ is not the equivalent of a detainer under the IAD); United States v. Bamman, 737 F.2d 413, 415-16 (4th Cir.1984) (state prison officials' knowledge of federal investigation and decision to segregate prisoner, followed by issuance of federal writ was not "functional equivalent" of a detainer for purposes of the IAD), cert. denied, 469 U.S. 1110, 105 S.Ct. 789, 83 L.Ed.2d 783 (1985); United States v. Trammel, 813 F.2d. 946, 949 (7th Cir.1987) (holding "a detainer must issue from an act prior to and separate from the issuance of a subsequent writ of habeas corpus ad prosequendum").
[7] 100 N.J. 627, 498 A.2d 1239 (1985), cert. denied, 475 U.S. 1014, 106 S.Ct. 1193, 89 L.Ed.2d 308 (1986).